NOT DESIGNATED FOR PUBLICATION

No. 118,234

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JARED RALPH GIHRING,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; GRANT D. BANNISTER, judge. Opinion filed April 26, 2019. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

ARNOLD-BURGER, C.J.: Jared Gihring was charged with rape of two Kansas State University (KSU) freshmen women—S.W. and C.S. In both cases, the State charged him with rape under the theory that the victims were incapable of giving consent because of the effect of alcohol. In S.W.'s case, Gihring was also charged in the alternative with rape under the theory that S.W. was unconscious or physically powerless. The jury convicted him only of the rape of S.W. on the theory that she was unconscious or physically powerless. On appeal, Gihring contends that the trial court committed reversible error

1

(1) by joining the two cases into one trial and (2) by excluding evidence that S.W. had sex with another man hours earlier. He also claims that the prosecutor committed error in statements made during voir dire and closing arguments. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We first set out the facts of each case, described as the S.W. case and the C.S. case respectively.

*The S.W. Case*

S.W. was a freshman at KSU and had pledged to a sorority. On Saturday, April 26, 2014, a group of students, including several Sigma Nu fraternity members, gathered at Pillsbury Crossing Wildlife Area. S.W. drank vodka in the dormitory before leaving and in her friend's car on the way to Pillsbury Crossing. She had a handle of vodka, poured the vodka into a water cup, drank it like a shot, and repeated. She testified she was drunk when she arrived at Pillsbury Crossing at around 2 or 3 p.m. She continued to consume alcohol at Pillsbury Crossing. She drank a pint of Watermelon Pucker with a friend and then opened a Strawberita, which she poured out at the request of a police officer who approached her. The officer testified that S.W. was stumbling and that it looked like she was intoxicated. A friend, J.P., testified that S.W. was intoxicated when she left Pillsbury Crossing at around 3:30 or 4 p.m.

One of the last things that S.W. remembered was sitting in the bed of a red truck and seeing her ponytail holder falling into the water and just looking at it in the water. She also remembered lighting a cigarette off of the person sitting next to her. The next thing she remembered was "[w]aking up in the Sigma Nu Fraternity sleeping dorm to someone actively sexually assaulting me." She could feel a penis thrusting inside her vagina. S.W. testified, "[w]hen I woke up I was still very confused, disoriented. It was

2

foggy. I was unsure of why it was not still 3 o'clock and why I was not still at Pillsbury Crossing." She testified, "When I woke up, I could tell that I had been sleeping. I opened my eyes and realized that they had not yet been opened." The red exit light illuminated the darkness in the sleeping room. She was naked in the bottom of a bunk bed. S.W. was only able to see partially outside of the bunk bed, as sheets hung down from the top bunk. Confused, she asked the man if he was using a condom. She explained she did not scream and run because "I wasn't sure what was happening, if I had known this person, who he was. . . . I really couldn't get past the idea of why I am not still out at Pillsbury Crossing, why it is not light out." She later identified the man as Gihring. She had never met Gihring before this encounter. Gihring was not at Pillsbury Crossing to witness any of S.W.'s behavior there and there is no evidence that he witnessed any activity, sexual or otherwise, between S.W. and anyone else before he approached S.W. in someone else's dormatory bed. There is also no indication that Gihring was intoxicated when he approached S.W.

When Gihring went to retrieve a condom, S.W. searched for her clothes. When she could not find them, she went out the only exit door that was immediately accessible, which led to a balcony. It was nighttime. She was on the top floor of the fraternity house. There was a mattress on the balcony. Gihring came out onto the balcony and was "again coercing and engaging in sexual acts" with her. S.W. was still confused. Less than 30 seconds into this, "my mind gets clear enough to know what's happening is not something that I had ever wanted and I immediately got up from the mattress and left—went to the furthest corner of the balcony that would allow me to get as far away from the assailant as possible." Gihring made a comment to the effect of "two brothers in one day." S.W. "had no idea what he was talking about and immediately started to cry, started to shake, started to demand that we go back inside and find my clothing and that I get out of the house as soon as possible." Gihring quickly produced her clothing.

3

S.W. immediately got dressed and went downstairs to find her belongings, which she had put inside a white Jeep when she arrived at Pillsbury Crossing. She saw a vehicle she thought was the Jeep and looked for her phone. While in the Jeep, Gihring attempted to perform oral sex on her. S.W. yelled at him to stop, which he did. When she did not find her belongings, she moved to the front patio of the fraternity house. Jack Farquhar, a Sigma Nu fraternity member, was outside. He told S.W. that he had engaged in sex with her in the sleeping dorm. S.W. had no memory of having sex with Farquhar.

When S.W. got back to her dorm, she plugged in her phone and found numerous text messages. One person asked her about something he had heard happened at Pillsbury Crossing. She responded that she did not know because she was completely blacked out.

The other students that were at Pillsbury Crossing filled in some of the gaps in S.W.'s memory. Quinn Jones, a Sigma Nu fraternity member, saw S.W. at Pillsbury Crossing in the back of a red truck taking shots of Fireball, a cinnamon-flavored whiskey. The truck belonged to Farquhar. S.W. identified Farquhar as the person that she remembered lighting her cigarette. Farquhar and S.W. had not met before that day. After some conversation and flirtation, S.W. and Farquhar started kissing in the bed of the truck. They then got into the cab of the truck. Jones noticed that S.W. was "pretty intoxicated."

Farquhar gave S.W. a ride to the fraternity house from Pillsbury Crossing. After leaving his Jeep, she took Farquhar's hand and led him up to the sleeping dorm on the third floor of the fraternity house. He did not have to show her where it was because she already knew. S.W. was not falling or stumbling; he did not have to help her up the stairs. In the sleeping dorm, they went to Farquhar's bed. A privacy sheet hung from the top bunk, creating a sort of canopy bed. Farquhar testified that S.W. seemed coherent and seemed to understand what he was saying to her. Farquhar located a condom and the two had sex. Farquhar testified that there was nothing about her behavior or demeanor that led

4

him to believe she was incapable of consenting to sex. He testified that throughout their time together, S.W. was responsive and coherent.

Anthony Alvarez and another fraternity member were a floor below the dormitory room and heard Farquhar and S.W. having sex. So they attempted to initiate a "fumble drill" on Farquhar and S.W. A fumble drill is a fraternity prank where someone throws a football onto the bed in which another fraternity brother is having sex. After throwing the football, someone yells fumble, and then all of the fraternity brothers jump onto the bed. Farquhar heard two people sneaking up and told them to go away. Alvarez saw S.W. and Farquhar having oral sex.

Farquhar and S.W. fell asleep. Farquhar estimated that he slept for an hour. When he awoke, S.W. was still sleeping. He left a note on the bed saying she could find him in his study room downstairs when she awoke. Farquhar periodically checked on S.W., but she was still sleeping. The last time Farquhar checked on S.W., she was no longer in his bunk. He heard a noise outside. He looked out on the balcony and saw S.W. on her back on the mattress out there, with Gihring on top of her having sex. Gihring told Farquhar something along the lines of "we're busy." Farquhar shut the door and returned downstairs to his study room. Farquhar testified that S.W. was awake and making moaning and groaning noises. He did not see her try to stop the sexual activity. But he looked out on the balcony for less than five seconds.

Shortly thereafter, Gihring went down to Farquhar's study room. Farquhar testified that Gihring's "demeanor was that we did something wrong and that [S.W.] had been assaulted." Gihring told Farquhar that S.W. had said she was raped. Farquhar went downstairs and found S.W., who was visibly upset.

5

The next day, Jones asked Gihring what happened. Gihring said "he tapped [S.W.] on the shoulder" while she was either "laying down or sleeping" in the sleeping dorm. Gihring said he asked S.W. "do you want to have sex with me and she said yes."

On Monday, S.W. went to the hospital and underwent a sexual assault exam. S.W. was very tearful while there and told the nurse that she was awakened to a man having sex with her.

S.W. reported that she had been raped to the Office of Affirmative Action at KSU, to the Manhattan Crisis Center, to the Kansas State Women's Center, and to the Riley County Police Department. Initially, she told police that both Farquhar and Gihring had raped her. When Detective Brek Jager told S.W. that Farquhar and Gihring would defend themselves by saying the sex was consensual, she said "it sounds like it" and "it sounds like I was all about it."

Gihring was subsequently charged with the rape of S.W. while she was unconscious or in the alternative when she was too intoxicated to consent. Farquhar testified in Gihring's trial under a grant of immunity.

*The C.S. Case*

C.S. was also a freshman at Kansas State University. She lived in an apartment complex off campus. She had a boyfriend. She met Gihring at her apartment complex and the two exchanged phone numbers.

On Monday, October 5, 2015, C.S. was not permitted to take her biology test at 7 p.m. because she forgot to bring her I.D. C.S. contacted her roommate, M.B., and proposed that they "just hang out and get some alcohol and just kind of blow off some

6

steam." They contacted E.P. C.S., M.B., and E.P. purchased alcohol and took it back to C.S.'s apartment. Their accounts of the evening differed in several respects.

E.P. testified that C.S. had had a disagreement with her boyfriend that day and so she wanted to do a girls' night that evening. As the evening progressed, C.S. started getting very hyperactive and very unstable. She had a few mixed drinks and then started chugging out of a bottle of liquor. "[S]he was drinking a fair amount for her size." She was unable to maintain her balance very well. She had to stabilize herself on a counter and walked in a zigzag pattern. Her speech was slurred. She was not very coherent; she was not enunciating her words very well. She was texting someone on her phone. At some point, she left the apartment and returned with Gihring.

E.P. testified that at one point in the evening, C.S. went to her bedroom and Gihring followed her. A couple of minutes later, E.P. and M.B. went to check on her. They saw C.S. being held up and stabilized by Gihring. E.P. testified, "It looked like she couldn't hold herself up on her own." There was a bottle of liquor in C.S.'s room. Gihring handed E.P. the bottle outside of C.S.'s line of sight. E.P. hid it behind her back so C.S. would not see it. She did not want C.S. to resume drinking.

M.B. testified she did not see C.S. having to hold herself up; C.S. was very mobile but kind of stumbling around. C.S. was quite intoxicated and M.B. tried to get her to stop drinking. M.B. went into C.S.'s room and saw Gihring on the bed with his jeans off. C.S. was under the covers. M.B. told Gihring that he needed to put his pants on and go home. C.S. told M.B. that it was okay; that they were just talking.

E.P.'s boyfriend showed up and took E.P. and M.B. to IHOP. Before they left, M.B. got Gihring's phone number because she was concerned about C.S.

7

M.G. was another roommate of C.S. She was home that night doing homework and trying to sleep. She came out of her room multiple times to ask them to be quiet. She noticed C.S. "getting progressively more intoxicated." C.S. got louder, lost her balance, and slurred her words. C.S. was "very intoxicated." M.G. was "uncomfortable with how intoxicated she was. It made me worry." She testified C.S. "was not in control of herself."

C.S. remembered that she, E.P., and M.B. played a drinking game and that she was intoxicated. She acknowledged that she went looking for Gihring and brought him back to her apartment. She remembered being outside of Gihring's apartment and texting him that she was there. She remembered crying on the floor of her bedroom while Gihring rubbed her back. There was no indication that Gihring was intoxicated. C.S. remembered being in bed and texting her boyfriend. Gihring laid next to her and fondled her breasts, but she told him to stop because he was not her boyfriend. C.S. remembered Gihring on top of her. She also remembered being on top of him and asking him who he was. He said he was Jared. C.S. asked, "[Y]ou are not [my boyfriend]?" He said no. C.S. said to stop, that it was wrong. C.S. remembered his penis being inside her vagina and a flash of his penis in her mouth. She also remembered falling in the shower and hitting her elbow. When she woke up the next morning her vagina hurt so badly she could not urinate and she was covered in bruises.

The next morning, C.S. told her roommates "something bad had happened." C.S. was sad and upset. She did not remember much. She remembered being in bed with Gihring, being in the shower, falling in the shower, and Gihring penetrating her. C.S. said that he raped her.

C.S. went to class. On the way to class, she texted Gihring to figure out what had happened the night before. In the exchange, Gihring stated, "Well you were pretty drunk, so i basically had to watch over you for a while." They also had a discussion about whether she needed to go buy "plan b." When she questioned why he kept going when

she was very drunk, he said she pushed herself on him saying he was her boyfriend, and he was sorry and it would not happen again.

That same day, October 6, 2015, C.S. went to the hospital for a sexual assault examination. The sexual assault nurse examiner discovered bruises on her arms and legs and a vaginal tear. She found seminal fluid consistent with Gihring's DNA. On October 7, C.S. reported the incident to the Riley County Police Department.

Gihring was subsequently charged with the rape and aggravated criminal sodomy of C.S.

*The Pretrial Motions*

Before trial, Gihring moved to admit evidence of S.W.'s previous sexual conduct on the day that Gihring allegedly raped her. The trial court held a hearing on the motion. The following information was *not* introduced at trial. It was introduced only in a closed hearing before the trial court under the rape shield statute. See K.S.A. 2018 Supp. 21-5502.

Gihring wanted to admit evidence that after briefly meeting, S.W. and Farquhar had sexual intercourse in Farquhar's truck at Pillsbury Crossing. Further, they engaged in oral sex in the truck while traveling to the fraternity house and had sexual intercourse in the sleeping dorm at the fraternity house. Because of the public nature of these sex acts, several witnesses saw the sexual activity between S.W. and Farquhar. Gihring argued that the evidence was relevant to the issues of consent and to S.W.'s credibility. The trial court granted the motion in part and denied the motion in part. The court excluded evidence that S.W. had sex with Farquhar at Pillsbury Crossing and in Farquhar's truck on the way to the fraternity house, but the court allowed evidence that S.W. had sex with Farquhar at the fraternity house. The court's order stated, "If, at some point during the trial, the

9

defendant believes the door has somehow been opened to inquire about prohibited matters, permission must be sought and granted by the Court outside of the presence of the jury."

Gihring moved the court to reconsider. The trial court again held a hearing. Gihring argued that he had new information that, though S.W. told police she did not remember her sexual activity with Farquhar, she told a KSU representative that she was "unconscious" and raped by Farquhar. He argued that this was relevant to whether she was actually asleep or unconscious during the encounter with Gihring, or whether she simply did not remember consenting to it. Gihring also argued that he had new information that S.W.'s sorority had threatened to take action against her for not representing it well because of her public sexual activity with Farquhar, but the KSU representative asked the sorority not to pursue the action. Gihring argued that the sorority's scrutiny and that the blizzard of text messages and social media about the public sex gave S.W. a motive to fabricate the allegation that Gihring had raped her. The State disputed that S.W. had ever used the word "unconscious" in relation to Farquhar and said that there was no evidence the sorority even knew S.W. had any sexual conduct with Gihring. The court allowed Gihring to cross-examine S.W. about whether she had stated she was unconscious, but the court otherwise did not change its previous ruling. The court made clear that the parties could introduce evidence that S.W. and Farquhar were "making out" at Pillsbury Crossing.

Before trial, Gihring also moved to sever the charges into two separate trials. The State objected. The trial court held a hearing on the motion to sever. Gihring argued the only similarity between the two incidents was the nature of the charges and that everyone had been drinking alcohol. The court denied the motion to sever.

A jury found Gihring guilty of rape of S.W. under the theory that she was unconscious or physically powerless. The jury found him not guilty of the charges related

10

to C.S. The trial court sentenced Gihring to 155 months in prison and lifetime postrelease supervision. He timely appeals.

ANALYSIS

On appeal, Gihring contends the trial court committed reversible error by (1) joining the two cases into one trial and (2) excluding evidence that S.W. had sex with another man hours earlier. He also claims the prosecutor made statements that constitute reversible error in voir dire and closing arguments. We will examine each allegation of error.

*The cases of rape were not improperly joined.*

Gihring contends the trial court erred by denying his motion to sever the charges because joinder was not permissible under K.S.A. 22-3202 and K.S.A. 22-3203. He argues that even if joinder was permissible, it was an abuse of discretion not to sever the charges. Specifically, he argues that the similarities between the allegations by C.S. and S.W. were overly general; combining the charges into a single trial significantly increased the risk of jury confusion and jumbling; and evidence of one crime would not have been admissible at the trial for the other crime as propensity evidence under K.S.A. 60-455.

*We consider our standard of review.*

The appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. Kansas statute establishes the three conditions permitting the joining of

11

multiple crimes in a single complaint: (1) the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; *or* (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1). Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the trial court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Second, because K.S.A. 22-3202(1) provides that "charges 'may' be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion." *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Finally, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, that is, whether the error affected a party's substantial rights. K.S.A. 2018 Supp. 60-261; *Hurd*, 298 Kan. at 561.

On appeal from the denial of a motion to sever, the party claiming error has the burden to establish a clear abuse of discretion. *State v. Carr*, 300 Kan. 1, 94, 331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

That said, it is rare for appellate courts to overturn district court decisions related to joinder. See *State v. Bunyard*, 281 Kan. 392, 398, 133 P.3d 14 (2006), *disapproved on other grounds by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014). In making a determination as to joinder in this case, the only statutory issue the trial judge had to consider was whether the two charges of rape against Gihring "are of the same or similar character." K.S.A. 22-3202(1). The trial judge believed they were. We agree. We start by

looking at what is meant by the language of the statute requiring that the charges be "of the same or similar character."

> *We examine the definition of the statutory requirement that charges be "of the same or similar character."*

In *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014), the Kansas Supreme Court addressed consolidation of two cases for a single trial and summarized our caselaw analyzing the "same or similar character" condition for permitting joinder.

> "On the first statutory condition, crimes of the same or similar character, we note that earlier Kansas cases that have held consolidation or joinder to be appropriate have generally had multiple commonalities, not merely the same classification of one of the crimes charged. See *State v. Carr*, 300 Kan. 1, 101-04, 331 P.3d 544 (2014) (victims identified defendants; aspects of modus operandi consistent between crimes); *State v. Cruz*, 297 Kan. 1048, 1055, 307 P.3d 199 (2013) (both victims leaving nightclub at closing time; both accosted before reaching vehicle; both had little warning before shot repeatedly; same gun used; defendant identified in both cases; both cases charged first-degree murder, criminal possession of firearm); *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 (2007) (both victims drug dealers; defendant on quest for drugs during both; both victims shot with 9 mm handgun; both occurred in private dwellings; 5-day time span); *State v. Barksdale*, 266 Kan. 498, 506-10, 973 P.2d 165 (1999) (both crimes murder; victims killed in similar manner; robbery common motive); *State v. Crawford*, 255 Kan. 47, 48, 53-54, 872 P.2d 293 (1994) (both crimes robbery; victims identified defendant; similar modus operandi)." *Smith-Parker*, 301 Kan. at 157-58.

Here, the trial court found the primary charge of each case was rape, a severity level 1 person felony; both were scheduled for jury trial; both had the same kind of evidence and issues of consent or ability to consent and level of intoxication; both victims identified Gihring as the person that sexually assaulted them; it was undisputed that

sexual intercourse occurred in both cases; Gihring had permission to be at each location; both offenses occurred in housing primarily occupied by people of approximately the same age; the victims were of similar age and freshmen in college; both crimes occurred off of the college campus in Manhattan; both victims were alleged to be under the effects of a large amount of alcohol; each victim was alleged to have been sexually assaulted by Gihring after they had gone to bed; each was allegedly a crime of opportunity, each occurred in the same jurisdiction, and if found guilty, Gihring would face the same kind of punishment—incarceration—for any of the charges. We would add that in both cases, while the victims were highly intoxicated, there is no indication that Gihring was intoxicated but appeared to be in control of his faculties. The trial court also found that Gihring would not be deprived of any legal advantage by joinder because Gihring made no statements to law enforcement in either case. His statements from one case could not be used against him in the other case.

Gihring does not dispute the trial court's factual findings; he only contends that the similarities do not support the legal conclusion that joinder was appropriate because the similarities are overly general "and would encompass most sexual encounters around a college campus every weekend."

*We examine two key Kansas Supreme Court cases regarding joinder based on the crimes being of the same or similar character.*

The Kansas Supreme Court has found that joinder was appropriate in several cases very similar to this one. We will highlight two.

First, in *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165 (1999), Donald R. Barksdale was charged with and convicted of murdering Hosea Davis III and Jennifer Forgie. As to the Davis murder, Barksdale and Davis had been in the same cell block in

14

prison, and they spent almost every day together. Davis was found dead in his apartment. He died from blunt trauma to the head, but he also showed signs of strangulation. There were no witnesses. A friend of Barksdale's, Joe Campbell, later gave the police more information on the homicides in exchange for the State agreeing to speak to the parole board on his behalf. According to Campbell, Barksdale went to Davis' house and Davis showed Barksdale that he had two ounces of cocaine and $1,500 in cash. Barksdale started thinking of ways to steal the drugs and money. Barksdale and Davis began having sex, and during the act Barksdale strangled Davis with a phone cord.

Turning to the Forgie murder, Forgie worked at Best Cleaners. Barksdale went to the store on an afternoon that Forgie was working. There is no indication that Barksdale knew Forgie. Barksdale later told Campbell that he went to the store to pick up dry cleaning, but when Forgie left to retrieve his clothing he decided to rob the store. Barksdale told Campbell that he thought about raping Forgie, but decided to tie her up and leave. When Forgie started crying Barksdale decided to stab her with a knife he brought. An autopsy showed that Forgie had experienced a blunt force trauma to the head, strangulation, and multiple knife wounds. Multiple people entered Best Cleaners during or just after the murder. One person went into the store and saw Barksdale with a knife in his hand. Another person entered the store and heard a gurgling noise. That person found Forgie behind the counter and began calling 911 when a man behind her told her to put down the phone and leave. Two people saw Barksdale leaving Best Cleaners.

Barksdale argued that the two murders were not of the same or similar character so as to permit joinder. He cited many of the same factors that Gihring relies upon here. They were:

> "(1) the Davis murder carried with it an additional underlying felony of aggravated criminal sodomy that the Forgie murder did not; (2) Davis was a personal friend of the

15

defendant, while Forgie was a stranger; (3) strangulation was the cause of Forgie's death but not the cause of death in the Davis murder; (4) a knife was used in the Forgie murder, not a blunt instrument as used in the Davis murder; and (5) the same evidence was not necessary in order to prove both crimes and with the exception of Joe Campbell, none of the witnesses were the same for both cases." 266 Kan. at 508.

But the Kansas Supreme Court held that joinder was appropriate. It framed the issue as "whether the trial court's determination that the crimes were similar and, thus, subject to joinder was a decision with which no reasonable person would agree." 266 Kan. at 508. The court recounted the similarities between the murders. For both murders, robbery was the motive. Both victims were strangled and received blunt force trauma to the head. Both victims were tied up and left face down on the ground. The murders were committed in the same "general neighborhood in Wichita" and occurred within nine months of each other. 266 Kan. at 509. Finally, while "only one witness, Joe Campbell, was common to both cases, it is also true that both cases generally required the same mode of trial and the same kind of evidence, and resulted in the same kind of punishment." 266 Kan. at 509. The court concluded: "[T]he crimes with which the defendant was charged are not only sufficiently factually similar but also sufficiently similar in mode of trial and kind of evidence required, as well as punishment prescribed, that we cannot say that no reasonable person would agree with their joinder." 266 Kan. at 509.

Second, an instructive and factually similar case regarding what our Supreme Court views as appropriate joinder of charges for trial is *Bunyard*, 281 Kan. 392. There, Josiah Bunyard was tried on three separate charges of rape. The charges were joined for trial. The first charge involved A.P., an acquaintance of Bunyard. A.P. alleged that she visited Bunyard and fell asleep on his bed. She awoke to him on top of her removing her clothing. He forced her to have sex. Bunyard's friend was present, and testified that he only saw and heard consensual sex acts. The second charge arose when E.N. and Bunyard were in Bunyard's car. Bunyard and E.N. began engaging in consensual sexual

16

activity. However, E.N. says that she withdrew consent after they began and Bunyard did not stop. E.N. had met Bunyard the day before at a pool party. The third incident occurred when Bunyard went to visit L.B., his former girlfriend. L.B. said that while showing Bunyard around her apartment, she fell back on the bed. She alleged that Bunyard got on top of her and raped her. None of the three women alleged that Bunyard used a weapon, made threats, acted in anger, or attempted to injure them. The incidents occurred between 1999 and 2001. A jury convicted Bunyard of one count and acquitted him of the other two. He appealed, arguing that the trial court abused its discretion in denying his motion to sever the charges.

The Kansas Supreme Court found that joinder was appropriate. In fact, the court stated that the charges in the case presented "the greatest similarity of crimes as compared with prior cases on this issue." 281 Kan. at 401. The court noted that the defense in each case was consent. 281 Kan. at 401. It called the time span between the charges—a little over a year—insignificant. Additionally, the court said that weighing relative strength or weaknesses of the counts against each other is not an appropriate consideration in joinder analysis because there is no "mandate[] that only cases of equal strength or weakness may be joined together." 281 Kan. at 403. The court concluded by cautioning against a narrow interpretation of the joinder rule. 281 Kan. at 403.

*Bunyard* supports the conclusion that the facts in this case are similar enough to allow joinder. The alleged rapes in *Bunyard* are similar to those in this case. A.P. said that she was asleep when Bunyard began assaulting her; similarly, S.W. said she awoke to Gihring raping her. And both men had a witness to the rape charges arising from those incidents. Bunyard's other victims were acquaintances who were with him voluntarily, just as C.S. invited Gihring to be with her. There were no witnesses to the incidents occurring in those cases. Both in *Bunyard* and here, the alleged crimes took place in the span of over a year. There is no overlapping evidence. The Kansas Supreme Court said that the facts of *Bunyard* were very similar relative to the other joinder cases it had tried.

17

The facts in this case are similar to those in *Bunyard*, and comfortably fit within the joinder rule.

*We address the dissent and Gihring's arguments that joinder was not proper.*

In support of their conclusion that joinder was not appropriate here, Gihring and the dissent combined note seven factors supporting their conclusion that it was not appropriate to join the charges: (1) one victim knew Gihring while the other did not; (2) one alleged rape took place at a fraternity house and the other took place at an off-campus apartment; (3) there was a witness to S.W.'s alleged rape but not to C.S.'s; (4) the State charged Gihring with alternate theories of rape as to S.W. but not as to C.S.; (5) different victims were involved so the cases did not use the same evidence; (6) C.S. only alleged rape by Gihring, while S.W. alleged rape by both Gihring and Farquhar; and (7) C.S. remembered much of what happened, but S.W. did not remember what happened between she and Farquhar prior to her contact with Gihring. But these distinctions do not defeat joinder. Again, this is most evident from the Kansas Supreme Court's opinion *Barksdale*.

Both here and in *Barksdale*, there was one acquaintance victim and one stranger victim. While in this case both alleged rapes occurred in residences, Barksdale committed one murder in a residence and one at a public business. So the crime scenes in this case are actually more similar than those in *Barksdale*. There were no witnesses to the Davis murder, just as there were no witnesses to C.S.'s alleged rape. However, there were multiple witnesses involving the Forgie murder, just as there was a witness for S.W.'s alleged rape. In this case, the State did charge alternate theories of rape as to S.W. but not as to C.S. Although it is not clear from the *Barksdale* opinion, the parties' briefs in the case show that Barksdale was charged under alternate theories of first-degree felony murder and first-degree premeditated murder for both victims. For the Forgie murder, the underlying felony was aggravated robbery. For the Davis murder, the underlying felony

18

was aggravated robbery and/or aggravated criminal sodomy. See *Barksdale*, 266 Kan. at 508; Brief of Appellant, 1998 WL 35241564, at *2; Brief of Appellee, 1998 WL 35241565, at *8.

Finally, the *Barksdale* court held that the two murders relied on "the same kind of evidence" despite the fact that the cases had only one witness in common. 266 Kan. at 509; see also *State v. Gaither*, 283 Kan. 671, 686-87, 156 P.3d 602 (2007) ("[O]nly one witness testified about both shootings in this case. Nevertheless, both of Gaither's charges involved the same mode of trial, the same kind of evidence, and the same kind of punishment."). The dissent's analysis here suggests that the two charges to be joined must rely upon the same evidence, not just the same type of evidence, in order to be considered similar. However, the caselaw shows that the *type* of evidence is what matters for this analysis. In *Barksdale*, the evidence consisted of forensic evidence and witness testimony.

Here, the trial court concluded that the same types of evidence would be necessary to determine the issues of ability to consent and level of intoxication. This interpretation is also supported by *State v. Ritz*, 305 Kan. 956, 389 P.3d 969 (2017). There, the Kansas Supreme Court held that two charges for fleeing and eluding were of the same or similar character despite the fact that there were no witnesses common to both crimes. It affirmed the district court which "noted that the same type of evidence would be needed because both sets of charges would require the testimony of the officers who had participated in the chase." 305 Kan. at 960.

In arguing that his case is distinguishable from *Ritz*, Gihring argues:

"[T]he commonalities that the court found sufficient were commonalities *unique* to the fleeing-and-eludings as committed by the particular defendant and would not describe the vast majority of fleeing-and-eluding crimes. Here, however, as noted above, the

19

similarities are too general—they describe the vast majority of all sexual encounters in a college town. As such, they are generalities, which should not be the basis for joining the trials of two separate crimes."

There are a couple of problems with this reasoning. First, Gihring compared the fleeing and eluding crimes committed by the defendant to general fleeing and eluding crimes. But instead of comparing the rape charges to general rape crimes, he compares them to "all sexual encounters in a college town." This is inconsistent reasoning and does not make a lot of sense. If one compares the two rape charges in this case to the general crime of rape, one can see that there are several commonalities between the two charges that are unique to the rapes allegedly committed by Gihring: a sober assailant and drunk victim, the opportunistic nature of the sexual acts, similarly aged victims, victims living in college housing, and victims who were raped after going to bed.

The second and more troubling problem with Gihring's reasoning is that he believes that the facts of this case "describe the vast majority of all sexual encounters in a college town." This assertion is unsettling. Put in other words, Gihring is arguing that most sexual encounters in a college town occur with a sober male and a female who is so intoxicated that her friends are concerned for her health. In S.W.'s case, Gihring is arguing that most sexual encounters in a college town occur between two people who have never met before one of them wakes the other up and asks if she would like to have sex. Despite the fact that Gihring bears the burden of showing an abuse of discretion, he provides no evidence for this disturbing assertion. His argument on this point is unpersuasive.

The final two differences cited by the dissent are not so extreme as to require this court to find that the trial court abused its discretion. First, the dissent notes that C.S. only alleged being raped by Gihring, while S.W. alleged being raped by Farquhar and then Gihring. S.W.'s allegation of a different rape charge against Farquhar was not relevant to

20

her allegation against Gihring. It is not apparent why this difference would prejudice Gihring, or why it would make the cases so dissimilar as to find that the trial court abused its discretion.

The last difference the dissent cites is that C.S. remembered much of what happened the night of the alleged rape, but S.W. did not remember any of the sexual activity between her and Farquhar before she was allegedly raped by Gihring. But Farquhar was not on trial. S.W.'s memory as to Farquhar is not relevant as to Gihring's guilt or innocence. Additionally, S.W. remembered some facts related to what happened with Gihring. She testified that she woke up to him having sex with her. Although she was confused as to what was happening, she remembered asking Gihring if he was using a condom, searching for her clothes, fleeing the sleeping room, and being on the balcony mattress with Gihring. This is unlike her encounter with Farquhar, which she did not remember at all.

In conclusion, "[c]rimes against persons, particularly including sex crimes and crimes against children, have variances in the facts. No such crime is a clone of another." *Bunyard*, 281 Kan. at 401. Here, there are obviously differences between the two alleged rapes. But as *Barksdale* makes clear, the differences do not require this court to find that the trial court abused its discretion. There were a number of similarities which support the trial court's decision:  (1) both cases contained charges of rape, a severity level 1 person felony; (2) both allegations were scheduled for trial by jury; (3) both crimes have the same kind of evidence pertaining to issues of consent or ability to consent and level of intoxication; (4) whether sex occurred between the victims and Gihring was not disputed; (5) the victims were of similar age and freshman in college; (6) Gihring had permission to be at each location; (7) the crimes were ones of opportunity, occurring after the victims had consumed alcohol and then gone to bed; (8) all indications were that Gihring was sober and his victims were highly intoxicated; and (9) the crimes occurred in the same jurisdiction; and (10) both crimes would result in incarceration of Gihring if he were

21

convicted. While there are differences between the alleged rapes, "the differences are not material and . . . the similarities far outweigh the differences." *State v. Cromwell*, 253 Kan. 495, 511, 856 P.2d 1299 (1993). Many of these differences existed in *Barksdale* and *Bunyard*, but they did not prevent the Kansas Supreme Court from finding that joinder was appropriate. Accordingly, we have no trouble concluding that the trial court did not abuse its discretion in holding that the crimes were of the same or similar character.

*There was no prejudice resulting from the joinder that would justify severance.*

Even when joinder is proper under the statute, the district court maintains discretion to sever the charges "to prevent prejudice and manifest injustice to the defendant." *State v. Shaffer*, 229 Kan. 310, 312, 624 P.2d 440 (1981). Gihring argues that "the two cases presented a high likelihood of jury confusion and jumbling if they were tried together." Gihring asserts that joinder caused him significant prejudice, and that the trial court abused its discretion by refusing to sever the charges on this basis. We disagree.

The Kansas Supreme Court has warned against relying solely on generalities in joining charges because doing so would lead to "some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity." *State v. Thompson*, 139 Kan. 59, 62, 29 P.2d 1101 (1934). Gihring suggests that the trial court was required to sever the charges in his case to avoid "jumbling" and jury confusion.

Gihring's argument is unpersuasive for three reasons. First, Gihring's argument misconstrues the caselaw. The Kansas Supreme Court did not say that district courts must consider whether joinder will lead to jumbling of the charges. Rather, the court was explaining the policy underlying the rule that district courts should not rely solely on generalities when considering whether or not to join charges. 139 Kan. at 62.

22

Second, the jury was instructed that each crime charged was a separate and distinct offense and must be considered independently on the evidence and law applicable to each charge. On multiple occasions, the Kansas Supreme Court has rejected jury confusion arguments where such an instruction was given. *State v. Cruz*, 297 Kan. 1048, 1057-58, 307 P.3d 199 (2013); *Gaither*, 283 Kan. at 687; *Barksdale*, 266 Kan. at 510. This is because courts "can presume that the jury complied with the instruction." *Gaither*, 283 Kan. at 687. Additionally, "[a]ppellate courts have ascribed to the hypothetical presumption that such an instruction negates the inherently prejudicial effect of trying a person on multiple counts." *Cruz*, 297 Kan. at 1058. Here, the idea that the jury was not unduly influenced by the joinder is supported by its verdicts. The jury acquitted Gihring of the charges against C.S. Multiple cases have held that a split verdict is compelling evidence that the jury was able to differentiate the evidence and not jumble the charges. See *Cruz*, 297 Kan. at 1058 ("Sometimes, we view acquittals as compelling evidence of a jury's ability to differentiate between charges joined for trial."); *Bunyard*, 281 Kan. at 402; *State v. Davis*, 277 Kan. 231, 241, 83 P.3d 182 (2004). For these reasons, Gihring's claim of jury confusion does not warrant severance of the charges.

Finally, Gihring argues that the trial court erred when it concluded that, had the charges not been joined, evidence of one crime could be admitted at the trial of the other crime under K.S.A. 2018 Supp. 60-455. Both Gihring and the dissent conducted a K.S.A. 2018 Supp. 60-455 analysis and concluded that evidence of one charge would not have been admissible as evidence in the trial of the other charge. However, it is unnecessary to perform the K.S.A. 2018 Supp. 60-455 analysis. Even assuming for the sake of argument that the trial court erred in its 60-455 analysis that does not mean that joinder is inappropriate.

The requirements for admission of evidence under 60-455 are much higher than the requirements for joinder. *Bunyard*, 281 Kan. at 400. "[W]here the evidence of crimes joined for trial would have been admissible under K.S.A. 60-455 in a separate

23

prosecution, the defendant is unable to demonstrate any prejudice when the crimes are tried in a single trial." *Barksdale*, 266 Kan. at 510. However, "Kansas case law and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455." *Barksdale*, 266 Kan. at 510.

In multiple cases, similarly situated defendants have made the same argument as Gihring—that charges should not have been joined because evidence of one would not have been admitted in the trial of the other under K.S.A. 60-455. The Kansas Supreme Court has declined to perform the K.S.A. 60-455 analysis in these cases. See *Gaither*, 283 Kan. at 688 ("Applying the limitations of K.S.A. 60-455 to the joinder of charges would effectively nullify the application of K.S.A. 22-3202[1] when the crimes charged are of the same o[r] similar character."); *Bunyard*, 281 Kan. at 400-02; *State v. Plaskett*, 271 Kan. 995, 1020, 27 P.3d 890 (2001); *Barksdale*, 266 Kan. at 510.

Any prejudice resulting in joinder of the charges in this case is no greater than the prejudice in other joinder cases. In *Bunyard*, three charges of rape were joined for trial as opposed to two in this case. The additional charge likely added to the prejudicial effect of the joinder. As in this case, Bunyard argued that the joinder was prejudicial because it would lead to jury confusion and jumbling of the issues. He also asserted that the evidence would not be admissible under K.S.A. 60-455. But the Kansas Supreme Court found that Bunyard was not overly prejudiced by the joinder because the jury was instructed to consider each charge separately. The court bolstered its conclusion with the fact that the jury acquitted Bunyard of two of the charges. 281 Kan. at 402.

In sum, "[j]oinder is the rule and severance the exception. . . . [T]he question is whether the trial court's decision that the crimes were similar and therefore subject to joinder was a decision with which no reasonable person would agree." *Bunyard*, 281 Kan. at 403-04. Here, a reasonable person could agree with the trial court. The two

crimes were of a similar character. And, the prejudice that resulted from joinder was no greater than the prejudice that resulted in other joinder cases. Accordingly, we have no trouble concluding that the trial court did not abuse its discretion in denying Gihring's motion to sever.

*The trial court did not err by excluding evidence of S.W.'s prior sexual activity under the rape shield statute.*

Gihring contends that the trial court committed reversible error by excluding evidence that, on the day that Gihring allegedly raped her, S.W. had sex with Farquhar publicly at Pillsbury Crossing and in the car on the way to Sigma Nu; that her sorority sought disciplinary action against her for not representing it well; and that later she accused Farquhar of rape for these incidents. He contends the trial court violated his right to present a complete defense and his right to confront witnesses against him. We disagree.

As a preliminary matter, much of the evidence Gihring complains about *was* introduced at trial. Farquhar testified that he and S.W. had sex at the fraternity house. S.W. admitted she had alleged Farquhar raped her. Farquhar testified that S.W. was conscious and consented to having sex with him. Alvarez testified that he saw S.W. "giving [Farquhar] a blow job." The defense asked S.W. whether she recalled telling a KSU representative she was unconscious at Pillsbury Crossing. S.W. did not remember saying that. The only evidence excluded was that S.W. had sex with Farquhar in public at Pillsbury Crossing and in the truck on the way to the fraternity, that S.W.'s sorority was threatening to take action against her for not representing it well at Pillsbury Crossing, and that people were harassing S.W. on social media about her sexual conduct at Pillsbury Crossing.

The rape shield statute, K.S.A. 2018 Supp. 21-5502(b), prevents the consideration of just this type of evidence.

> "(b) Except as provided in subsection (c), in any prosecution to which this section applies, *evidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible*, and no reference shall be made thereto in any proceeding before the court, *except under the following conditions*: . . . The court shall conduct a hearing on the motion in camera. At the conclusion of the hearing, *if the court finds that evidence proposed to be offered by the defendant regarding the previous sexual conduct of the complaining witness is relevant and is not otherwise inadmissible as evidence, the court may make an order stating what evidence may be introduced by the defendant and the nature of the questions to be permitted*. The defendant may then offer evidence and question witnesses in accordance with the order of the court." (Emphases added.)

A defendant is certainly entitled to present his or her theory of defense. The exclusion of relevant, admissible, and noncumulative evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial. The defendant's right to present a defense, however, is limited by the statutory rules of evidence. *State v. Holman*, 295 Kan. 116, Syl. ¶ 5, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Relevancy "is the key consideration when applying the rape shield statute . . . which prohibits the admission of evidence of a rape victim's previous sexual conduct with any person, including the defendant, unless the district court first determines the evidence to be relevant and otherwise admissible." *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010). "Because relevant evidence may be admitted, the statute does not violate the defendant's rights to confront and cross-examine witnesses or to present witnesses as guaranteed by the Sixth Amendment to the United States Constitution and

26

Section 10 of the Kansas Constitution Bill of Rights." *State v. Atkinson*, 276 Kan. 920, 926, 80 P.3d 1143 (2003).

In enacting the rape shield statute, the Legislature "sent a clear message to the courts that a complaining witness' prior sexual conduct is generally inadmissible because the victim's prior sexual conduct, even with the defendant, does not of itself imply consent to the sexual conduct that forms the basis for the charged offense." *Holman*, 295 Kan. 116, Syl. ¶ 8. More specifically, there are two purposes of the rape shield statute: (1) to protect a victim of rape or sexual abuse from the trauma and unnecessary embarrassment resulting from irrelevant evidence of a victim's prior sexual activity and (2) to encourage victims to report and prosecute sexual crimes. *State v. Arrington*, 251 Kan. 747, 749-50, 840 P.2d 477 (1992). The rape shield statute "'merely serves to focus both judges' and attorneys' attention upon the fact that the victim's prior sexual activity is not generally relevant, reminding them that a victim's lack of chastity has no bearing whatsoever on her truthfulness and generally has no bearing on the important issue of consent.' [Citation omitted.]" *Atkinson*, 276 Kan. at 926. In this way, the rape shield statute recognizes "'that a rape victim suffers considerable trauma from the incident and that adding to her trauma by permitting untrammeled examination of the intimate details of her life is unnecessary.'" 276 Kan. at 927.

The statute does not preclude the admission of evidence that another person may have been guilty of the alleged sexual abuse or relevant evidence that impeaches the credibility and testimony of a witness. *Arrington*, 251 Kan. at 750. Prior sexual conduct evidence may be material if relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. *Holman*, 295 Kan. at 139.

On appeal, we are required to first review the issue of relevance, which has two components—materiality and probativeness.

"Materiality concerns whether the fact to be proved has a legitimate and effective bearing on the decision of the case. The appellate standard of review for materiality is de novo. On probativeness, the question is whether the offered evidence has any tendency in reason to prove a disputed material fact. An appellate court reviews probativity for abuse of discretion. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, an appellate court reviews the decision de novo." *Holman*, 295 Kan. 116, Syl. ¶ 6.

When addressing whether prior sexual conduct of a complaining witness is relevant to the issues of consent and credibility, factors the trial court should consider include:

"(1) whether there was prior sexual conduct by complainant with the defendant; (2) whether the prior sexual conduct rebuts medical evidence on proof of origin of semen, venereal disease, or pregnancy; (3) whether distinctive sexual patterns so closely resemble the defendant's version of the alleged encounter so as to tend to prove consent or to diminish the complainant's credibility on the questioned occasion; (4) whether prior sexual conduct by the complainant with others, known to the defendant, tends to prove he or she believed the complainant was consenting to his or her sexual advances; (5) whether sexual conduct tends to prove the complainant's motive to fabricate the charge; (6) whether evidence tends to rebut proof by the prosecution regarding the complainant's past sexual conduct; (7) whether evidence of sexual conduct is offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act charged; and (8) whether the prior sexual conduct and the charged act of the defendant are proximate in time." *State v. Lackey*, 280 Kan. 190, Syl. ¶ 8, 120 P.3d 332 (2005), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006).

The dissent and Gihring, in combination, argue that S.W.'s sexual activity with Farquhar at Pillsbury Crossing and in the truck was relevant because (1) it demonstrated a

sexual pattern that tends to prove consent; (2) it tends to prove the complainant's motive to fabricate the charge; (3) the prior acts and the charged acts were proximate in time; and (4) it diminishes the complainant's credibility that she did not consent on the questioned occasion. We will examine the error in each of these arguments.

*(1) Sexual pattern that tends to prove consent*

Gihring contends the fact that S.W. was conscious and consented to sex with Farquhar tends to make it more likely that she was also conscious and consented to sex with Gihring. He contends "[S.W.] had a pattern—at least on the day in question—of engaging in sex that appeared to all who saw her to be consensual while she appeared conscious, but then later pursuing rape charges against that sexual partner."

Gihring was not prevented from offering this defense. He fails to explain how Farquhar and S.W.'s *public* sexual intercourse in Farquhar's truck was relevant to his defense. Rather, it appears that Gihring wanted to do precisely what the rape shield law was meant to prevent—remind the jury that S.W. was unchaste because she was someone who would engage in sexual intercourse in public. Gihring was able to call witnesses that observed Farquhar and S.W. "making out" at Pillsbury Crossing, S.W. leading Farquhar up to the sleeping dorm at the fraternity house, and S.W. and Farquhar having sex in his bed surrounded by privacy sheets. Gihring was able to offer evidence that the sex with Farquhar was consensual, but that S.W. did not remember it and told police that he raped her. Gihring was able to question S.W. about whether she had claimed she was unconscious at Pillsbury Crossing.

The trial court distinguished the sexual activity at the fraternity house from the sexual activity in the truck because of the private versus public location and that the activity in the truck was observed by others. The trial court's decision was sound.

29

There is little factual similarity between the sex with Farquhar in Farquhar's truck and the assault by Gihring in the sleeping dorm. The sex with Farquhar began at Pillsbury Crossing with the two flirting and having a conversation, progressed to making out, and then to sex while others could observe them and while S.W. was conscious. Although she did not remember having sex with Farquhar, she remembered meeting him. The dissent finds it critical that Gihring should have been able to present this evidence because it shows how quickly S.W. turned a "by chance" meeting into a sexual encounter. Slip op. at 60. In contrast (in the best light for Gihring), there was no "by chance" meeting between S.W. and Gihring. S.W. was sleeping in the sleeping dorm in a bed surrounded by privacy sheets when Gihring approached her and began having sex with her. There is no testimony that Gihring even saw S.W. in the dorm room having sex with Farquhar, and he was not at Pillsbury Crossing to observe their activity. The public sex with Farquhar does not tend to show that S.W. was conscious and consented to sex with Gihring.

The trial court stated: "A jury might conclude from these facts that [S.W.] quickly consented to sexual conduct with [Farquhar]. That does not in and of itself show [S.W.] consented to sexual conduct with the defendant. Particularly, if [S.W.] was incapable of giving consent to the defendant." Attempting to establish that a complainant had a propensity to engage in spontaneous voluntary sex because she had engaged in spontaneous voluntary sex with another man is exactly the type of evidence the rape shield statute was designed to exclude. See *Lackey*, 280 Kan. at 221-22.

This case can be distinguished from *State v. Perez*, 26 Kan. App. 2d 777, 995 P.2d 372 (1999). In *Perez*, this court said "a complaining witness' prior sexual behavior is relevant to credibility when the witness' past sexual activities are so factually similar to the defendant's version of the incident in question as to diminish his or her credibility." 26 Kan. App. 2d at 781. In *Perez*, this court found the complainant's sexual intercourse with two others at a party only hours before the alleged rape was relevant to show that the

30

complainant's version of events was not credible. 26 Kan. App. 2d at 782. At the party, the complainant had sex with two men where Perez and others could observe their activities. Later, Perez contended he and the complainant attempted to have sex in the back seat of a car while another person drove the vehicle. The court found the incidents "strikingly similar because they demonstrate C.I.'s unusual willingness to engage in intercourse while other individuals observed." 26 Kan. App. 2d at 782. There was semen present in the complainant's rape examination and Perez was not permitted to explain the existence of the other semen donors, even though Perez' defense was that he did not have sexual intercourse with the complainant. The court also commented that the jury was not provided a full explanation regarding how the complainant, a young girl, ended up in the countryside with two men. 26 Kan. App. 2d at 786.

Here, there was no semen present in S.W.'s rape examination. Gihring did not deny having sex with S.W. The jury was given an explanation of how S.W. ended up at the fraternity house. It was undisputed that S.W. was sleeping in the fraternity sleeping dorm before the incident with Gihring. And the trial court did permit Gihring to offer evidence that S.W. had sex with Farquhar just hours earlier.

*(2) Motive to fabricate*

Gihring contends the fact that S.W.'s sorority threatened disciplinary action against her for having sex publicly with Farquhar and that people were texting her about her having sex publicly with Farquhar gave her a motivation to fabricate the allegation against Gihring to protect her reputation and her standing in the sorority.

The trial court did not find a connection between the sorority disciplinary action and the allegation that Gihring raped her. Gihring offered no evidence that the sorority knew about the incident with Gihring. Moreover, Farquhar testified that S.W. said she was raped the night of the assault before leaving the fraternity house. At that time, she did

31

not know the sorority would attempt disciplinary action against her or that people had texted her about having sex with Farquhar. She did not even know she had had sex with Farquhar. Gihring's contention that S.W. had a motive to fabricate is too speculative and uncorroborated to be probative. See *Berriozabal*, 291 Kan. at 588.

### (3) Proximate in time

Gihring contends the sexual conduct with Farquhar was proximate in time to the alleged rape by Gihring. The trial court found the "proximity of the Pillsbury Crossing sexual conduct is less proximate and relevant than other sexual conduct." The sex in the truck was proximate in time to the rape by Gihring—about six to seven hours apart. But proximity in time, without more, is not sufficient to show relevance.

### (4) Complainant's credibility

Gihring contends the fact that S.W. alleged Farquhar raped her, when there were witnesses to the contrary, was relevant to impeach her claim that Gihring raped her.

As stated above, Gihring was able to offer this defense. The additional evidence he wanted to admit that S.W. had sex with Farquhar in public would not impeach her credibility regarding whether Gihring raped her; rather, it would only serve to paint S.W. as unchaste.

*Even if the trial court erred by excluding evidence of S.W.'s prior sexual activity under the rape shield statute, the error was harmless.*

Even if we could conclude there was error in excluding the requested evidence, we have no trouble concluding that it was harmless beyond a reasonable doubt. See *State v.*

32

*Gilliland*, 294 Kan. 519, 542, 276 P.3d 165 (2012) (applying harmless standard of K.S.A. 60-2105 and K.S.A. 60-261 rather than constitutional standard); *Atkinson*, 276 Kan. at 925 (applying constitutional harmless error standard). Gihring was permitted to introduce evidence that Farquhar and S.W. had sex at the fraternity house after just meeting that day, that S.W. claimed he raped her, that she consented to the sex with Farquhar, that she might have later said she was unconscious at Pillsbury Crossing, and any observations of S.W. at Pillsbury Crossing except the sex itself. We have no trouble finding beyond a reasonable doubt that the introduction of the additional evidence that (1) S.W. had sex with Farquhar in public at Pillsbury Crossing and in the truck on the way to the fraternity; (2) S.W.'s sorority was threatening to take action against her for not representing it well at Pillsbury Crossing; and (3) people were harassing S.W. on social media about her sexual conduct at Pillsbury Crossing, would not have changed the jury's perception of the case and its ultimate verdict.

*The prosecutor's comments during voir dire and closing arguments did not amount to reversible error.*

Gihring contends the prosecutor committed error during voir dire and closing arguments.

The appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional

33

constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

A claim of prosecutorial error based on comments made during voir dire, opening statements, or closing argument will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012).

*Voir Dire*

When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006).

Gihring contends that the prosecutor erred in voir dire by telling the jury that if the State proved each element beyond a reasonable doubt, the jury *had* to convict.

According to Gihring, the prosecutor misstated the law because the jurors have the power to acquit the defendant, even if they find beyond a reasonable doubt that he is guilty. Gihring points to particular exchanges with the prosecutor questioning the jurors. With some context added, those exchanges are as follows:

"Q.     I'm telling you that there [are] three elements aside from—that has to happen in Kansas. The victim was incapable of giving consent because of alcoholic liquor, the defendant knew of that fact or it was reasonably apparent, and that sexual intercourse occurred. If we prove to you those three—those three elements beyond a reasonable doubt, will you find the defendant guilty?

"A.     Yes.

"Q.     All of the switches are on, right?

"A.     Yes.

"Q.     And you would have to find him guilty, right?

"A.     Yes.

"Q.     Does anyone disagree with that? And what I'm telling you is if I prove to you—I used to—I used to try to convince the jury that they should find the defendant guilty, etc. What I'm telling you is that if the law—if you are going to sit on this jury, if all of the elements are met *you have to find the defendant guilty if we prove it all beyond a reasonable doubt*. Mr. Jensen, is that something that you could do?

. . . .

"Q.     . . . But Ms. Smith . . . if I prove to you the three elements that are necessary to prove the crime beyond a reasonable doubt, can you find the defendant guilty even if the victim wanted to have sex?

"A.     (Juror Smith) Yes.

"Q.     That's tough, right? That's a tough decision.

"A.     Uh-huh.

"Q.     And I'm telling you that *if you are going to serve on this jury, you have to be able to say if the State meets all of the elements beyond a reasonable doubt then I'll find the defendant guilty*. . . .

. . . .

"A.     (Juror McKeeman) Are you saying that she was just flirtatious or she said I'm going to have sex?

"Q.     I'm telling you it doesn't matter. Let's say she wants to have sex.

"A.     I'm going to have a problem with that.

"Q.     I'm not telling you that those are the facts of the case.

"A.     Okay.

35

"Q.     But I'm saying it's—I'm telling you she's so drunk she's incapable of giving
         consent, and the defendant knows it—or a person knows it but she says let's have
         sex.

"A.     I would have a problem with that.

. . . .

"Q.     Okay. So just like if a thirteen year old girl would tell a man I want to have sex, it
         doesn't matter.

"A.     [Juror Masterson] Okay.

"Q.     You are too immature to make that decision. The same theory would be if the
         person is too intoxicated that it doesn't matter if you want to have sex because
         you are too intoxicated to give consent. Do you understand that?

"A.     Yes.

"Q.     Okay. Having clarified that do you still have any concern?

"A.     No.

. . . .

"Q.     . . . But ultimately, you are going to make the decision about whether she had the
         ability to consent.

"A.     I think it would be very difficult for me to make that decision even based on
         witnesses testimony.

"Q.     Okay. Thank you. Again, Ms. Smith, I'm not telling you that you are going to
         have a victim come in here and say I wanted to have sex. I'm taking this to the
         extreme because the point being, *if all of the boxes are checked, you have to find
         him guilty.*

"A.     I understand that.

. . . .

"Q.     *And if he is aware of her level of intoxication, that she can't give consent and
         takes advantage of it, he's guilty.*" (Emphases added.)

Under Kansas law, "jurors must swear or affirm to try the case conscientiously and
return a verdict *according to the law* and the evidence." (Emphasis added.) K.S.A. 2018
Supp. 60-247(d).

36

"The administration of justice cannot be left to community standards or community conscience but must depend upon the protections afforded by the rule of law. *The jury must be directed to apply the rules of law to the evidence* even though it must do so in the face of public outcry and indignation. Disregard for the principles of established law creates anarchy and destroys the very protections which the law affords an accused. Finally, to permit a jury to disregard the principles of law laid down by a trial court is contrary to the statutory law of this state. [Citation omitted.]

. . . .

"Although it must be conceded that the jurors in a criminal case have the raw physical power to disregard both the rules of law and the evidence in order to acquit a defendant, it is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon." (Emphasis added.) *State v. McClanahan*, 212 Kan. 208, 216-17, 510 P.2d 153 (1973).

In *Smith-Parker*, 301 Kan. 132, Syl. ¶ 6, our Supreme Court held that "[a]lthough a criminal jury should not be instructed on its inherent power of nullification, a jury instruction telling the jury it 'must' or 'will' enter a verdict is too close to directing a verdict for the State." The court found it was error for the court to instruct the jury, "'If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you *will* enter a verdict of guilty.'" 301 Kan. at 163. The court found the instruction "essentially forbade the jury from exercising its power of nullification." 301 Kan. at 164. The court distinguished the terms "'must'" and "'will'" from "'should.'" 301 Kan. at 164.

But in *State v. Robinson*, 303 Kan. 11, 334, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017), the Kansas Supreme Court not only distinguished *Smith-Parker* but also cast doubt on it by stating: "Indeed, the possibility of jury nullification logically requires, as a necessary precondition, the existence of a mandatory charge from the court, such as 'shall impose.'" That seems to be consistent with the *McClanahan* court's discussion of jury nullification

as a "raw physical power" that exists despite that the court's instruction to follow the law. *McClanahan*, 212 Kan. at 216-17.

Regardless, this case can be distinguished from *Smith-Parker*. First, the prosecutor was questioning the potential jurors' ability to apply a law to the facts. A prosecutor can address an issue of bias with potential jurors. See *State v. Alvarez*, No. 112,637, 2016 WL 1169395, at *8 (Kan. App. 2016) (unpublished opinion). Second, the prosecutor used the term "have to" rather than "must" or "will." See *Smith-Parker*, 301 Kan. 132, Syl. ¶ 6 Third, the timing makes a significant difference. In *Smith-Parker*, the problematic instruction was provided by the court at the end of trial, as deliberations began. Here, the prosecutor made comments during voir dire, before the trial began. After the prosecutor passed the panel for cause, the trial court instructed the jury, "None of what you have heard are jury instructions. Ultimately, evidence will only come from the witness stand, exhibits, or stipulations. And the jury instructions will come from me." Further, the court instructed the jury properly at the end of trial—"If you have no reasonable doubt about the truth of each of the claims that the State must prove, you *should* find the Defendant guilty." (Emphasis added.) The effect of any error during voir dire would have been likely erased by the later correct instruction. See *State v. Carter*, 305 Kan. 139, 160, 380 P.3d 189 (2016) (error in reasonable doubt instruction given to potential jurors before voir dire was not clear error); *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015) (the extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial).

*Closing Arguments*

The prosecutor cannot make comments that serve no purpose other than to inflame the passions of the jury. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013).

38

Gihring contends the prosecutor erred during closing argument by attempting to inflame the passions and prejudices of the jury with the following comment:

"Look at what the defendant told Quinn Jones. . . . [H]e asked the defendant what happened and the defendant said well [S.W.] was laying in bed—couldn't remember whether she was asleep or not—but she was laying in bed, the defendant said he came up to her, tapped her on the shoulder and asked her if she wanted to have sex and she said yes. That's coming from the defendant. *And the first question you should ask yourself is, who does that? If you take what the defendant told Quinn Jones as absolutely the truth, who does that? Who walks up to a girl who was laying in someone else's bed, with privacy sheets hanging down, taps her on the shoulder and says hey do you want to have sex? Isn't that strange? Even in the light best—best light for the defendant, I think that you would have to admit that's just weird.*" (Emphasis added.)

The prosecutor's comment "that's just weird" was certainly not the most artful way to articulate his concern regarding Gihring's behavior. It was clearly a call to the jury to use its common sense in questioning the credibility of such an assertion by Gihring. Moreover, Gihring's contention that his conduct, though reprehensible, was perfectly legal is not necessarily true. Remember, Gihring told his friend Jones that S.W. was either "laying down or sleeping" when he tapped her on the shoulder. The jury could have accepted Gihring's version of events as true and still found that S.W. was "unconscious or physically powerless" and did not consent to the sexual intercourse. See *State v. Brown*, No. 92,430, 2005 WL 2949771, at *2 (Kan. App. 2005) (unpublished opinion) (finding evidence sufficient when victim testified she did not consent and that "'I vaguely came conscious-because I didn't know whether I was unconscious. . . . I'm like, why am I here with you, why are you doing this me?'"). Or the jury could have accepted Gihring's version of events and found him guilty of the alternative charge—that S.W. was too intoxicated to consent. The jury chose the former. So we agree that the prosecutor could have phrased his comment better. But the prosecutor's comment was not clear error.

39

Alternatively, prosecutors can tell jurors to use common sense when evaluating the credibility of the defendant's version of events. For example, the Supreme Court explained in *State v. Donaldson*, 279 Kan. 694, 707, 112 P.3d 99 (2005):

> "Donaldson says it was improper for the prosecutor to say: 'He's going to make himself guilty of felony murder to help a friend?' The defendant first told Detective Chisholm the version of events as had been stated on the videotape he had made for Harris. Under that version, Donaldson knew about the bogus drug deal and that Jackson had a gun. Donaldson placed himself in the car, yet claimed he passed out. The prosecutor was appealing to the jury's common sense in assessing the credibility of the first statement, which placed Donaldson in the midst of felony murder. This was clearly proper."

The prosecutor's comments here are a similar appeal to the jury's common sense in assessing the credibility of Gihring's statement that he approached a woman he did not know, who he had apparently never seen before, who is in a bed that was not his, who was further secluded by a canopy of sheets, who was sleeping, and awakened her to ask her if she wanted to have sex, thus making it an entirely consensual encounter. This is not behavior that, using a juror's common sense, would inform a reasonable person that this was valid consent for sex. Accordingly, we find that there is no reasonable possibility that any error by the prosecutor contributed to the verdict.

In sum, we find all Gihring's allegations of error to be unpersuasive and affirm his conviction by a jury of his peers in a well-tried and well-judged case.

* * *

GREEN, J., dissenting:  The majority opinion sets a far too low standard for a prosecutor's closing arguments when they infringed on a defendant's right to a fair trial. Indeed, in a prosecutor error case involving comments made during closing argument, Justice Biles recognized the difficult hurdle that defendants must clear before a criminal conviction is reversed because of a prosecutor's improper comments:  "To be sure, it is rare for this court to reverse a criminal conviction due to a prosecutor's improper commentary during closing arguments." *State v. McBride*, 307 Kan. 60, 72, 405 P.3d 1196 (2017). Nevertheless, Justice Biles also declared:  "But as we noted in *Sherman*, these cases obligate the judiciary to 'focus on and vindicate the dual interests of justice that are present in a criminal case—*viz*., the rights of the defendant to receive a fair trial and society's need to punish and deter crime.' *Sherman*, 305 Kan. at 93." 307 Kan. at 72. As I will discuss below, the prosecutor's comments in this case were plain wrong, improper, and unprofessional. Moreover, the prosecutor's improper and unprofessional commentary runs through all of Gihring's main arguments.

*Prosecutorial Error*

As stated earlier under the modified *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) standard, appellate courts use a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

41

In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]"

Moreover, a claim of prosecutorial error based on closing argument will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012). When analyzing prosecutors' statements for prosecutorial error, "[c]ourts do not isolate the challenged comments; they consider them in the context they were made. [Citation omitted.]" *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018).

*Closing Arguments*

The prosecutor cannot make comments that serve no purpose other than to inflame the passions of the jury. *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). Gihring contends that the prosecutor attempted to inflame the passions and prejudices of the jury when he improperly commented on Gihring's character. The prosecutor stated:

"Look at what the defendant told Quinn Jones . . . . [H]e asked the defendant what happened and the defendant said well [S.W.] was laying in bed—couldn't remember whether she was asleep or not—but she was laying in bed, the defendant said he came up to her, tapped her on the shoulder and asked her if she wanted to have sex and she said yes. That's coming from the defendant. *And the first question you should ask yourself is, who does that? If you take what the defendant told Quinn Jones as absolutely the truth, who does that? Who walks up to a girl who was laying in someone else's bed, with*

42

*privacy sheets hanging down, taps her on the shoulder and says hey do you want to have*
*sex? Isn't that strange? Even in the light best—best light for the defendant, I think that*
*you would have to admit that's just weird.*" (Emphasis added.)

The State contends that the remarks were proper and were supported by the evidence. On the other hand, the majority maintains that the prosecutor's comments were proper to tell the jurors to use their common sense when assessing the credibility of Gihring's consent claim. I disagree on both counts. The prosecutor's remarks were an ad hominem personal attack designed to inflame the jury.

Specifically, a prosecutor errs when he or she makes statements designed to inflame the jury's passions or prejudices. *Stimec*, 297 Kan. at 128-29; *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006) (reaffirming that prosecutors may not make comments designed to inflame the passions or prejudices of the jury, or comments intended to distract the jury from its duty to make decisions based on the evidence and controlling law). "This means that a prosecutor has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and 'must guard against appeals to jurors' sympathies or prejudices.'" *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014).

Gihring's principal defense was the credibility of S.W. Moreover, the State had to grant transactional immunity to produce another key witness: Jack Farquhar. In fact, the prosecutor told the jury that "[w]e gave [Farquhar] immunity to get him on to the stand." Thus, the State explicitly conceded that Farquhar (a twice accused rapist of S.W.) was no disinterested witness in S.W.'s case.

In addition, the evidence against Gihring was not overwhelming. For example, the jury acquitted him of one count of rape and one count of aggravated criminal sodomy of C.S. Moreover, the jury acquitted him of rape of S.W. under the theory that she was

43

unable to give consent because of the effects of alcohol. As a result, the credibility of S.W. and her ability to accurately perceive and to remember the events of April 26, 2014, were critical to Gihring's defense.

The prosecutor told the jurors that the first question they should ask is: "[W]ho does that? Who walks up to a girl who was laying in someone else's bed, with privacy sheets hanging down, taps her on the shoulder and says hey do you want to have sex?" Then the prosecutor rhetorically asked, "*Isn't that strange?*" (Emphasis added.) Then the prosecutor commented: "*Even in the light best—best light for the defendant, I think that you would have to admit that's just weird.*" (Emphasis added.)

An abusive ad hominem argument consists of attacking one's opponent in a personal and abusive way as a means of discrediting an opponent's position or argument. Here, the prosecutor's rhetorical questions and comments—"[W]ho *does that? If you take what the defendant told Quinn Jones as absolutely the truth, who does that? Who walks up to a girl who was laying in someone else's bed, with privacy sheets hanging down, taps her on the shoulder and says hey do you want to have sex? Isn't that strange? Even in the light best—best light for the defendant, I think that you would have to admit that's just weird.*"—were clearly used to discredit Gihring's assertion that his sexual intercourse with S.W. was consensual. For example, the prosecutor advanced what he found personally distasteful about Gihring's crass sexual behavior as a reason for the jurors to reject Gihring's assertion that his sexual intercourse with S.W. was consensual by exclaiming twice to the jury: "[W]ho does that?"

Moreover, the prosecutor pointed to what he believed was Gihring's vulgar personal characteristic (weirdness) towards sex as a ploy to distract the jury away from Gihring's assertion that his sexual intercourse with S.W. was consensual. See *State v. Nesbitt*, 308 Kan. 45, 57, 417 P.3d 1058 (2018) (Statement "had no

44

purpose other than inflaming the passions of jurors, distracting them from their task."). As a result, the prosecutor's abusive ad hominem argument blunted the force of Gihring's assertion that his sexual intercourse with S.W. was consensual. This was error.

In addition, the prosecutor's ad hominem argument attacked Gihring's character. Obviously, the prosecutor's reference to Gihring's crass sexual behavior as *strange* and *weird* was designed to impugn his character or integrity. Indeed, in his closing comments to the jury, the prosecutor told the jury: "The defendant is someone who will sexually assault a young woman he is entrusted to take care of." I could find no evidence in the record that Gihring was ever entrusted to take care of S.W. Even so, the prosecutor's comment was obviously made to impugn his character. It suggested to the jury that he was no gentleman.

In a trial where jurors are asked to accept the testimony of a witness, it is certainly proper for the opposing party to introduce evidence affecting the witness' credibility. But the prosecutor's argument that Gihring's assertion should be discredited because of his *strange* and *weird* sexual behavior does not provide evidence that what he asserted was false. Indeed, this is a fallacy because the truth or falsity about Gihring's assertion of consent, or the strength of an argument for it, has nothing to do with his character or integrity.

When character is to be used as a basis for inference to conduct, evidence of specific acts or instances of conduct has generally been excluded. K.S.A. 60-422(d). This practice of excluding specific acts or instances of conduct protects a party against undue prejudice and unfair surprise. Thus, the prosecutor's impeachment argument like this one, relating to Gihring's character traits not in issue, was improper.

45

*The prosecutor's comments took advantage of the trial court's rape shield ruling to Gihring's detriment.*

As Gihring points out in his brief, the prosecutor's questions and comments were particularly troubling given the trial court's rape shield ruling. He agrues that "the prosecutor used the rape shield as both a shield to protect S.W.'s privacy and a sword to impermissibly attack Mr. Gihring's credibility." Indeed, he notes that the prosecutor's questions and comments fostered a suggestion "that no person would have sex with someone after just meeting them, or would merely walk up to someone and ask to have sex, and that this conduct [was] so odd that it warrants condemnation." Nevertheless, Gihring contends that "this was exactly what [S.W.] did when she met Farquhar." He points out that she had sex with Farquhar in the cab of his truck a short time after meeting him. But the trial court's rape shield ruling prevented him from rebutting the prosecutor's comments to the jury—"[W]ho does that?". . . [W]ho does that?. . . Isn't that strange? . . . [T]hat's just weird."—when the trial court excluded the evidence of S.W.'s and Farquhar's sexual intercourse at Pillsbury Crossing. As a result, Gihring argues that this error was extremely harmful to his defense because the jury never had a chance to compare S.W.'s and Farquhar's seemingly consensual sexual interaction with each other after briefly meeting at Pillsbury Crossing to S.W.'s and Gihring's sexual interaction with each other at the fraternity house.

*Bolstering S.W.'s and Farquhar's Credibility*

After the prosecutor made his ad hominem remarks attacking Gihring's character, he proceeded immediately to improperly bolster S.W.'s credibility. The prosecutor told the jury that S.W.'s case revolved around this issue: "It's disputed when [Gihring] says he tapped [S.W.] on the shoulder and she woke up. Is that what happened, that she woke up? And he said yes. [S.W.] says I never woke up. I woke up to him having sex with me." Then the prosecutor asked the jury two questions: "What motive does [S.W.] have to

46

make up this story? What does she get out of this?" A short while later, the prosecutor told the jury that there was a way to determine if a person is credible:

> "Part of the way to determine credibility is looking at what a person has gone through. Look at what [S.W.] has got from coming forward. She's got the joy of having the sexual assault done to her. She got referred to one university office after another. She got to be examined by the Riley County Police Department not one time but four different times. Do you remember Officer Toolin examined her the first time and then Detective Jager examined her four—or three different times. A total of four different times. And think about this. If [S.W.] is making all of this up about waking up to the defendant having sex with her, this would mean that she's done all of those things for nothing, that she knowingly had sex and then she's just making this up. I mean this: In order for her to tell you what the defendant did to her, [S.W.] had to come forward and tell you how drunk she got, she had to tell you that she blacked out, she had to have this sex with Jack Farquhar disclosed. And I'm sure that she wishes she would have just stayed in the dorm that day but she has come forward and she's taken all of the hits that go with coming forward and all of the negative things that people are going to think about going out and getting drunk so that she could tell you what Jared Gihring did to her. Doesn't that give her testimony credibility?"

Here, the prosecutor's argument to the jury fostered a suggestion that if S.W. were willing to come forward and put herself through this tragic ordeal in her life, she must be credited about what she says Gihring did to her. Nevertheless, a prosecutor may not bolster the credibility of a witness. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015) (prosecutor's comments in closing argument bolstering the credibility of witnesses); see also *State v. Ramey*, 50 Kan. App. 2d 82, 92-93, 322 P.3d 404 (2014) (prosecutor improperly vouched for witness credibility with personal opinion). Thus, the prosecutor improperly bolstered S.W.'s credibility with his personal opinion that S.W. would have not put herself through this ordeal unless she was telling the truth.

In addition, the prosecutor vouched for Farquhar's testimony. In arguing for his veracity, the prosecutor told the jury: "[Farquhar] can still face prosecution to what he told the police earlier." Here, the prosecutor seemed to suggest to the jury that Farquhar could be prosecuted for perjury if he testified falsely. Therefore, his testimony should be believed. See *State v. Potter*, 69 N.C. App. 199, 204, 316 S.E.2d 359 (1984) (Prosecutor's argument suggesting that State witnesses could be prosecuted for perjury, fired from their jobs, and lose retirement or pension if they testified falsely, constituted improper vouching.). Prosecutors should not be allowed to use the weight of their office to vouch for the credibility of witnesses.

In making these arguments, the prosecutor stepped outside the wide latitude afforded prosecutors in closing arguments. Here, the prosecutor attempted to bolster the credibility of S.W. and Farquhar with these arguments. Indeed, after making the argument in support of S.W.'s credibility, the prosecutor asked the jury: "Doesn't that give her testimony credibility?" This was prosecutorial error.

*Misstatement of Law*

A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see also *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015) (prosecutor's statement that, in effect, asserted the defendant could not rely on inconsistent defenses was a misstatement of the law and impermissible).

Here, the prosecutor specifically told the jurors: "But you have another piece of evidence in this case that will help you decide the issue. How does the defendant act around intoxicated women? Now the Judge has told you that the charges in this case

48

[C.S.'s case] are separate but that doesn't mean you can't use evidence in one person's case in the other. So let's look at [S.W.'s] case." The prosecutor later told the jurors: "These cases are circular. [C.S.'s] case supports [S.W.'s.] [S.W.'s] case supports [C.S.'s.] The defendant is someone who will sexually assault a young woman he is entrusted to take care of."

This argument, however, mischaracterizes the law. Moreover, these comments are in violation of the following jury instruction: "You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge." This language is contained in PIK Crim. 4th 68.060 (2016 Supp.):

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

See also *State v. Cameron & Bentley*, 216 Kan. 644, 650-51, 533 P.2d 1255 (1975) (citing the multiple verdict instruction with approval).

Here, the prosecutor argued a question of law with a view of contradicting a jury instruction. Indeed, the prosecutor's closing argument concerning the jury instructions should have been confined by the jury instructions given by the court, and any discussion or interpretation of the jury instructions tending to question or contradict the correctness of law laid down by the court should not have been tolerated.

Moreover, the prosecutor's argument to the jury fostered a misstatement of the law that Gihring's guilt in one case could support his guilt in the other case. Thus, the prosecutor's argument implied a propensity relationship between the two cases—the evidence in S.W.'s case supports the evidence in C.S.'s case and vice versa. The

49

prosecutor's argument clearly contradicted and injected confusion into how the jurors were to use this previously mentioned instruction in their deliberations. Although the jury found Gihring not guilty in C.S.'s case, we do not know if some jurors were confused or misled by this misstatement of law argument and simply agreed to find him guilty under an alternative theory in S.W.'s case.

In making this argument, the prosecutor clearly stepped outside the wide latitude afforded prosecutors in closing arguments. The prosecutor told the jury that it did not have to decide each charge separately on the evidence and the law applicable to it. This was a misstatement of law and prosecutorial error. See *Tahah*, 302 Kan. at 791 (prosecutor's misstatement of law in closing argument "constitutes error").

### *Prejudice*

There remains the second step of the *Sherman* holding:  Did the prosecutor's errors prejudice Gihring's due process rights to a fair trial?

In sum, as stated earlier, the evidence against Gihring was not overwhelming. S.W.'s and Farquhar's trial testimony was the critical evidence in this rape case, so the jury's credibility determination about what they said was key. Moreover, S.W.'s and Farquhar's credibility is what the prosecutor tried to bolster. The prosecutor bolstered S.W.'s credibility by attacking Gihring's character with the ad hominem argument; by describing Gihring as someone "who will sexually assault a young woman he is entrusted to take care of"; by describing the arduous circumstances S.W. had to go through as the complaining witness; and by misstating the law in telling the jury that C.S.'s case and S.W.'s case complemented each other to such a degree that they formed a complete circle. Thus, the prosecutor's comments would only unfairly evoke personal prejudices of the jurors.

50

Moreover, the prosecutor bolstered Farquhar's credibility by suggesting to the jury that he still faced prosecution for what he told the police if he testified falsely. This was improper vouching of Farquhar's credibility.

*Jury Deliberation*

During deliberations, the jury sent two notes and one question to the trial court. Both notes and question regarded S.W.'s case. The jury's first note stated: "The jury would like to see copies of the police reports taken from [S.W.] and the defendant on this matter." The trial court's response to the jury was as follows: "Please refer to jury instructions, particularly No. 1, second paragraph. The requested items were not admitted into evidence."

The jury's second note stated: "The transcript of [S.W.'s] testimony." The trial court conducted a read back to the jury of S.W.'s testimony. The jury's first note focused on S.W.'s and Gihring's statements to the police. The jury's second note concentrated on S.W.'s trial testimony. As stated earlier, the credibility of S.W. and her ability to accurately perceive and remember the events of that day were key to this case. Here, the prosecutor's previously mentioned closing arguments and comments all went to undermine Gihring's credibility and his defense of consent.

Thus, I have difficulty in concluding, as the majority does, that "there is no reasonable possibility that any error by the prosecutor contributed to the verdict." Slip op. at 40. The majority's holding tells prosecutors that the risk in making prejudicial closing arguments to a jury is worth taking because error and prejudice will seldom be found as Justice Biles acknowledged in *McBride*.

Nevertheless, the prosecutor's comments were not intended to convey to the jurors to use their common sense when assessing the credibility of Gihring's consent claim.

51

Instead, the prosecutor's commentary was intended to injure Gihring's character and credibility in the eyes of the jurors. In so doing, the prosecutor departed from separating proper and legitimate arguments from personal and inflammatory attacks. Moreover, the previously discussed misstatement of law alone denied Gihring a fair trial because the facts were such that the jurors "could have been confused or misled by the statement." *State v. Hall,* 292 Kan. 841, 849, 257 P.3d 272 (2011). Thus, there is more than a reasonable possibility that the prosecutor's errors contributed to the verdict and denied Gihring a fair trial. I would reverse his conviction and remand this case for a new trial based on the previously mentioned prosecutorial errors.

In addition, Gihring argues two additional reasons why he was denied a fair trial. I will turn next to both of these arguments.

*Gihring contends that the trial court infringed on his right to present a complete defense.*

Gihring argues that exclusion of S.W.'s previous sexual activities with Farquhar at Pillsbury Crossing and in his truck under the rape shield statute must yield to his right to present a complete defense because of the following: (1) the evidence showed a sexual pattern that tends to prove consent; (2) the evidence tended to prove the complainant's motive to fabricate the charge; (3) the evidence of previous acts and charged acts were proximate in time; and (4) the evidence diminished the complainant's credibility that she did not consent on the questioned occasion. Although the majority agrees that the sex in the truck was proximate in time to S.W.'s rape accusation against Gihring, I disagree with the majority's conclusion that the remaining evidence was not relevant. As a result, I will discuss this evidence and its relevance to this appeal.

*(1) Sexual pattern that tends to prove consent*

Gihring contends the fact that S..W. was conscious and consented to sex with Farquhar tends to make it more likely that she was also conscious and consented to sex with him. He further contends that "S.W. had a pattern—at least on the day in question—of engaging in sex that appeared to all who [witnessed] her [actions] to be consensual while she appeared conscious, but then later pursuing rape charges against that sexual partner."

Indeed, the sexual acts between S.W. and Farquhar at Pillsbury Crossing were seemingly consensual because of the public nature of their sexual acts and because of the observations of other witnesses to their sexual acts. Moreover, Farquhar testified that while in the sleeping area of the fraternity house, S.W. seemed coherent and seemed to understand what he was saying to her. Farquhar testified that he located a condom and that the two had sex. Farquhar further testified that there was nothing about her behavior or demeanor that led him to believe she was incapable of consenting to sex. He also testified that throughout their time together, S.W. was responsive and coherent.

Anthony Alvarez and another fraternity member could hear Farquhar and S.W. having sex down on the second floor of the fraternity house. Farquhar would later testify that neither he nor S.W. attempted to be quiet about their sexual activity. So when he heard the two fraternity brothers sneaking up on them, Farquhar told them to go away. Alvarez also testified that he saw S.W. and Farquhar having oral sex.

Nevertheless, when Farquhar told S.W. that they had engaged in sexual intercourse in the sleeping area of the fraternity house, S.W. said she had no memory of that. S.W. further testified that after her ponytail holder fell into the water while she was at Pillsbury Crossing, she had no further memory of any of the events occurring at Pillsbury Crossing. In addition, she testified that she had no memory of anything until she

53

awoke at the fraternity house while Gihring was engaging in sexual intercourse with her. Thus, S.W. had absolutely no memory of the two rapes she accused Farquhar of committing against her.

Within an approximate six-to seven-hour period from 4 to 10 or 11 p.m., S.W. accused two men in three rapes: (1) once by Farquhar at Pillsbury Crossing; (2) once by Farquhar in the fraternity house; and (3) once by Gihring in the fraternity house. Contrary to the trial court's rape shield ruling, the cross-examination of S.W. and Farquhar about their sexual intercourse at Pillsbury Crossing and about their oral sex during their drive to the fraternity house was relevant as to Gihring's contention that his sexual intercourse with S.W. was consensual. Indeed, contrasting Gihring's acts to those of Farquhar and S.W. at Pillsbury Crossing and to those of S.W. and Farquhar during their drive to the fraternity house, this evidence was of crucial probative value to Gihring. This evidence was important because S.W. steadily maintained that her sexual intercourse with Farquhar in the cab of his truck at Pillsbury Crossing was rape. Furthermore, S.W. maintained that Farquhar had raped her again in the fraternity house. Nevertheless, she had no memory of either rape, although she was able to specifically describe the various kinds of alcohol she had consumed that day before the Pillsbury Crossing rape.

Thus, I have difficulty in concluding, as the majority does, that S.W.'s public sexual intercourse in Farquhar's truck served only to paint S.W. as unchaste. To the contrary, S.W. placed her credibility and memory in issue when she accused Farquhar of raping her in his truck at Pillsbury Crossing. For example, because there were eyewitnesses who contradicted S.W.'s rape accusation against Farquhar for the Pillsbury Crossing rape, this placed her credibility and memory in issue concerning her truthfulness about her rape accusations against Farquhar and about her rape accusation against Gihring.

54

Moreover, when the trial in this matter was conducted, Farquhar had not been charged in either of S.W.'s two rape accusations against him. In addition, as stated earlier, Farquhar received transactional immunity from the State for his trial testimony in this case.

Thus, refusal of cross-examination of S.W. and Farquhar about their seemingly consensual sex at Pillsbury Crossing and her later rape accusation against him cut off a vital line of impeachment evidence for Gihring. For example, the testimony of Farquhar and the other eyewitnesses who observed S.W.'s and Farquhar's seemingly consensual sexual interactions at Pillsbury Crossing and their seemingly consensual oral sex on their drive to the fraternity house would have contradicted S.W.'s Pillsbury Crossing rape accusation against Farquhar. This direct contradictory evidence would have called into question S.W.'s credibility and her complete lack of memory of the details surrounding the Pillsbury Crossing rape accusation against Farquhar. Indeed, this contradictory evidence was extremely relevant because it was proximate in time to S.W.'s rape accusation against Gihring.

As a result, the trial court violated Gihring's right to present a complete defense when it precluded him from testing S.W.'s memory and credibility about her rape accusation against Farquhar at Pillsbury Crossing.

*(2) Possible motive to fabricate*

Gihring contends that because S.W.'s sex with Farquhar at Pillsbury Crossing was relevant to uncovering potential motives for fabricating rape accusations against Farquhar and Gihring, this evidence should have been admitted. This contention has merit. For example, S.W.'s lack of memory about her sexual activity at Pillsbury Crossing, her lack of memory about her sexual activity during the drive to the fraternity house, and her lack of memory about her sexual activity with Farquhar at the fraternity house shows a

55

possible motive to fabricate her lack of consent. Her motive may have arisen from a desire to avoid censure by her peers, including at her sorority. For example, S.W.'s sexual activity at Pillsbury Crossing was witnessed by others, was recorded on video, and was posted on social media. Shortly after it was posted on social media, it was alleged that S.W. started receiving communications about whether she was the person pictured in the video. Indeed, when S.W. returned to her dorm, a person asked her about what had happened at Pillsbury Crossing. She retorted that she did not know because she had blacked out.

Generally, it is improbable that someone should remember what he or she professes to remember and, yet, forget or have no memory about the other things connected to those things remembered. Here, the trial court prevented Gihring from presenting a complete defense by barring him from questioning S.W. on her possible motives for fabricating her rape accusations against him and Farquhar.

*(3) Proximate in time*

Gihring contends that the sexual conduct with Farquhar was proximate in time to the alleged rape by Gihring. As Gihring points out in his brief, S.W.'s prior sexual conduct with Farquhar at Pillsbury Crossing and in Farquhar's truck on the way to the Sigma Nu fraternity from Pillsbury Crossing was relevant because it was proximate in time:

> "Indeed, [S.W.] alleged she was raped by Farquhar at Pillsbury Crossing, then again by Farquhar at the fraternity, and then by Mr. Gihring at the fraternity. Though the district court correctly noted that the sex at the fraternity between Farquhar and [S.W.] was *more* proximate in time than the public sex at Pillsbury Crossing, the sex and [S.W.]'s state of mind—particularly the fact she was conscious—and her behavior towards sex at Pillsbury Crossing were still highly proximate in time to the alleged rape by Mr. Gihring."

56

While Gihring did not provide this court with an accounting of time on appeal, he bears the burden to establish abuse of discretion. See *State v. Stafford*, 296 Kan. 25, 45, 290 P.3d 562 (2012). An independent examination of the record shows about six to seven hours between S.W.'s sexual encounters with Farquhar at Pillsbury Crossing and in his truck and S.W.'s sexual interaction with Gihring at the fraternity house.

A six- to seven-hour gap between encounters is closer in length to those cases where the rape shield was pierced than it is to those cases where the rape shield was not pierced. In *State v. Perez*, 26 Kan. App. 2d 777, 781, 995 P.2d 372 (1999), this court found it was appropriate to pierce the rape shield and allow in evidence of the victim's sexual contact with other men "an hour or two" before her sexual contact with the defendant. On the other hand, in *State v. Lackey*, 280 Kan. 190, 221, 120 P.3d 332 (2005), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006), our Supreme Court ruled: "The victim's alleged prior sexual conduct and the defendant's charged act were not proximate in time, as those allegations were made by previous neighbors of the victim some 6 months to 1 year prior to the incident in this case." Similarly, in *State v. Montes*, 28 Kan. App. 2d 768, 774, 21 P.3d 592 (2001), this court ruled that the prior sexual acts were not proximate in time for the purpose of rape shield analysis when the acts occurred one to two months before the charged conduct.

In sum, the trial court, as the majority concedes, made an error of law when it held that the evidence of the Pillsbury Crossing sex and the truck sex was not proximate in time to S.W.'s rape accusation against Gihring.

### (4) Complainant's credibility

Gihring contends that S.W.'s accusation that Farquhar had raped her at Pillsbury Crossing, although there were witnesses to the contrary, was relevant to impeach her claim that Gihring had raped her. To be sure, if the public sex S.W. engaged in with

57

Farquhar at Pillsbury Crossing was consensual based on Farquhar's account and on the accounts of other eyewitnesses and if S.W. had no memory concerning her sexual encounters with Farquhar at Pillsbury Crossing and at the fraternity house, S.W.'s lack of memory would weigh against her credibility. The credibility issue would focus on the following: (1) between those things S.W. professed to have remembered (the various kinds of alcohol she had consumed that day) and cannot be readily contradicted on and (2) between those things she declared not to have remembered and on which she would be open to contradiction. S.W.'s rape accusations against Farquhar are open to contradiction. For example, S.W. would be open to contradiction about her seemingly consensual sexual activity with Farquhar at Pillsbury Crossing and her seemingly consensual oral sex with Farquhar on their drive to the fraternity house and about her later accusation against Farquhar for raping her at Pillsbury Crossing. In addition, S.W. would be open to contradiction about her seemingly consensual sexual activity with Farquhar at the fraternity house, which was overheard by two witnesses and observed by one witness, and about her later accusation against Farquhar for rape.

Accordingly, it is readily apparent that the trial court interfered with Gihring's defense, preventing him from presenting a complete defense when it barred him from questioning S.W. and Farquhar about their seemingly consensual sexual activity at Pillsbury Crossing and their seemingly consensual sexual activity during their drive from Pillsbury Crossing to the fraternity house and about her later accusation of rape against Farquhar for that described sexual activity.

Thus, this previously mentioned direct contradictory evidence was relevant and material on the issue of consent concerning S.W.'s rape accusation against Gihring.

*Harmless Error*

When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only where the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]). For violation of the defendant's right to confront witnesses, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Atkinson*, 276 Kan. 920, Syl. ¶ 6. While engaging in this analysis, a court considers "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." 276 Kan. 920, Syl. ¶ 6.

An appellate court "will review the entire record and use the same analysis, applying K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, depending on the nature of the right allegedly affected." *Ward*, 292 Kan. at 570.

When both the constitutional and nonconstitutional error clearly arise from the very same acts or omissions, appellate review begins with the harmless analysis of the constitutional error. If the court decides the constitutional error is not harmless and reverses the convictions, there is no point in analyzing whether the lower standard for harmless error under K.S.A. 60-261 has been met. *State v. Logsdon*, 304 Kan. 3, 40, 371 P.3d 836 (2016).

The issue whether Gihring initiated sexual intercourse with S.W. while she was asleep boils down to a credibility determination— S.W. testified she was asleep when Gihring initiated sexual intercourse with her. Gihring maintained she was awake and she consented to sexual intercourse with him. Nevertheless, Gihring was not allowed to test S.W.'s credibility and her absence of memory about her seemingly consensual sexual activity with Farquhar in the cab of his truck at Pillsbury Crossing and in the cab of his truck on the way to the fraternity house. As Gihring notes in his brief, S.W. maintained that Farquhar had raped her at Pillsbury Crossing. Nevertheless, S.W.'s rape accusations against Farquhar were challenged because of what other eyewitnesses had observed at Pillsbury Crossing. Moreover, Farquhar received transactional immunity from the State for his testimony because of what other eyewitnesses had observed concerning the sexual activity between S.W. and Farquhar at Pillsbury Crossing. Yet, the trial court prohibited Gihring from questioning S.W. (1) about her previous statements supporting an absence of memory concerning her seemingly consensual sexual activity between her and Farquhar at Pillsbury Crossing and about their seemingly consensual sexual activity on the drive to the fraternity house and (2) about her previous statements supporting that she believed her sexual activity with Farquhar before entering the fraternity house was rape.

Furthermore, Gihring was not allowed to question S.W. and Farquhar about how quickly their by-chance meeting moved to engaging in an intimate sexual act at Pillsbury Crossing. Questioning S.W. about the quickness their meeting developed into sexual intercourse was critical to Gihring's defense. Moreover, as considered earlier, the error stemming from the trial court's ban on asking S.W. these questions was compounded by the prosecutor's comments during closing arguments. The prosecutor weaponized the trial court's rape shield ruling by attacking Gihring's character and credibility based on the way in which he approached S.W. for sex by stating to the jury: "[W]ho does that? . . . [W]ho does that? . . . Isn't that strange? . . . [T]hat's just weird."

Although Gihring was allowed to admit evidence *through Farquhar and his fraternity brothers* (1) that Farquhar and S.W. had sex at the fraternity house after just meeting that day, (2) that S.W. claimed Farquhar had raped her concerning their sexual intercourse at the fraternity house, and (3) that S.W. consented to the sex with Farquhar at the fraternity house, this evidence is distinguishable from the evidence of S.W. and Farquhar's sexual conduct immediately before entering the fraternity house. To begin with, because of the public nature of S.W.'s and Farquhar's earlier sexual conduct, more witnesses could attest to the apparent consensual nature of their conduct.

Moreover, because of the trial court's rape shield ruling, Gihring was not allowed to develop a contrast between the things S.W. remembered and the things not remembered concerning her accusations of rape against both Farquhar and Gihring. The evidence concerning S.W.'s and Farquhar's sexual conduct before entering the fraternity, as well as S.W.'s total lack of memory about that sexual conduct, was critically relevant to Gihring's defense. The exclusion of this evidence prevented Gihring from developing evidence tending (1) to support S.W.'s consent, (2) to show a possible motive for why S.W. accused Farquhar and Gihring of three rapes, (3) to develop the timeline of events, and (4) to impeach S.W.'s credibility or memory or both.

Under our standard of review, I am unable to conclude, as the majority does, that the restrictions on the cross-examination of S.W. and Farquhar about their sexual intercourse at Pillsbury Crossing and about their oral sex on the drive to the fraternity house were harmless beyond a reasonable doubt. As a result, I would reverse and remand this case for a new trial.

*Motion to Sever the Charges*

Gihring contends the trial court erred by denying his motion to sever the charges because joinder was not permissible under K.S.A. 22-3202 and K.S.A. 22-3203. He

61

argues that even if joinder was permissible, it was an abuse of discretion not to sever the charges. Specifically, he argues that the similarities between the accusations by C.S. and S.W. were overly general; combining the charges into a single trial significantly increased the risk of jury confusion and jumbling; and evidence of one crime would not have been admissible at the trial for the other crime as propensity evidence under K.S.A. 60-455.

The appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3202 permits joinder. Under that statute, multiple complaints against a defendant can be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) establishes the three conditions permitting the joining of multiple crimes in a single complaint: (1) the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, and the appellate court will review the trial court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017).

Second, because K.S.A. 22-3202(1) provides that "charges 'may' be joined, a district court retains discretion to deny a joinder request even if a statutory condition is met. We review this decision for an abuse of discretion." *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Finally, if an error occurred in the preceding steps, an appellate court determines whether the error resulted in prejudice, that is, whether the error affected a party's substantial rights. K.S.A. 2018 Supp. 60-261. *Hurd*, 298 Kan. at 561.

On appeal from the denial of a motion to sever, the party claiming error has the burden to establish a clear abuse of discretion. *State v. Carr*, 300 Kan. 1, 94, 331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

The issue here is whether the charges relating to C.S. and S.W. were of the same or similar character. The *Ritz* court recently summarized the various tests the court has articulated on this subject:

> "We have previously articulated a general test for determining when joinder is appropriate:
> "'When all of the offenses are of the same general character, require the same mode of trial and the same kind of evidence, and occur in the same jurisdiction . . . .' *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 (1994). [Citation omitted.]
> "Later, in *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165 (1999), this court recited this test:
> ""'So far as the joinder of separate offenses in the same information is concerned, the test is: Are the charges of the same general nature and will the joinder deprive the defendant of an advantage in the trial, or are they incongruous and repugnant in character and will they operate to deprive the defendant of some legal advantage?"' 266 Kan. at 507.
> "The *Barksdale* court also warned 'against relying solely on generalities when considering the propriety of joinder.' 266 Kan. at 508.
> > ""'. . . The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial . . . ."'
> "More recently, in *State v. Smith-Parker*, 301 Kan. 132, 340 P.3d 485 (2014), we addressed consolidation of two cases for a single trial and summarized our caselaw analyzing the 'same or similar character' condition for permitting joinder.
> "'On the first statutory condition, crimes of the same or similar character, we note that earlier Kansas cases that have held consolidation or joinder to be appropriate have generally had multiple commonalities, not merely the same classification of one of the crimes charged. See *State v. Carr*, 300 Kan. 1, 101-04, 331 P.3d 544 (2014) (victims identified defendants; aspects of modus operandi consistent between crimes); *State v.*

63

*Cruz*, 297 Kan. 1048, 1055, 307 P.3d 199 (2013) (both victims leaving nightclub at closing time; both accosted before reaching vehicle; both had little warning before shot repeatedly; same gun used; defendant identified in both cases; both cases charged first-degree murder, criminal possession of firearm); *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 (2007) (both victims drug dealers; defendant on quest for drugs during both; both victims shot with 9 mm handgun; both occurred in private dwellings; 5-day time span); *State v. Barksdale*, 266 Kan. 498, 506-10, 973 P.2d 165 (1999) (both crimes murder; victims killed in similar manner; robbery common motive); *State v. Crawford*, 255 Kan. 47, 48, 53-54, 872 P.2d 293 (1994) (both crimes robbery; victims identified defendant; similar modus operandi).' *Smith-Parker*, 301 Kan. at 157-58." *Ritz*, 305 Kan. at 962-63.

Gihring argues that the trial court erred by denying his motion to sever because (1) joinder was not permissible under K.S.A. 22-3203; (2) even if it was permissible, it was an abuse of discretion not to sever the charges into separate trials; and (3) the error prejudiced his substantial rights and denied him a fair trial.

### *Consisting of the Same or Similar Character*

Under K.S.A. 22-3203, charges can be tried together if, under K.S.A. 22-3202(1), they could have initially been charged in the same complaint. Here, Gihring was initially charged based on only the accusations made by C.S., then, the State amended the complaint to also include charges based on the accusations made by S.W.

Charges can be brought in the same complaint under K.S.A. 22-3202(1) *if* (1) the charges are of "the same or similar character." See *Ritz*, 305 Kan. at 962. Here, the trial court made the following factual findings that the two crimes were of the same or similar character:  (1) both cases contained charges of rape, a severity level 1 person felony; (2) both accusations were scheduled for trial by jury; (3) both crimes have "the same kind of evidence pertaining to issues of consent or ability to consent and level of intoxication";

64

(4) whether sex occurred between the victim and Gihring was not disputed; (5) the victims were of similar age; (6) Gihring had permission to be at each location; (7) the crimes were ones of opportunity, occurring after the victims had consumed alcohol and then gone to bed; and (8) the crimes occurred in the same jurisdiction at an off-campus location, and both crimes would result in the incarceration of Gihring if he were convicted.

Gihring does not dispute that these similarities exist. Rather, he argues that these similarities do not support the legal conclusion that joinder was appropriate. He further argues that these similarities are overly general and would encompass most sexual encounters around a college campus every weekend.

In *State v. Barksdale*, 266 Kan. 498, 508, 973 P.2d 165 (1999), our Supreme Court, quoting *State v. Thompson*, 139 Kan. 59, 61-62, 29 P.2d 1101 (1934), pointed out that it had warned against relying solely on generalities when considering if joinder was proper:

> "'That offenses must be of the same general character is not always a sound test of joinder. In this instance the two crimes charged were of the same general character, in that they both involved force and violence to the person. That, however, would not necessarily be sufficient. To illustrate: As the culmination of a long-standing quarrel about a line fence, a farmer kills his neighbor. He goes to town, and the same afternoon, while in an excited frame of mind, he becomes involved in an altercation about a business matter, and makes an assault with some kind of a deadly weapon with intent to kill. *While the offenses are of the same general character, there should be separate informations and separate trials. The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity*.'" (Emphasis added.)

In *State v. Coburn*, 38 Kan. App. 2d 1036, 1045, 176 P.3d 203 (2008), this court noted that "Kansas sex offense laws are similar to those found in most states. Rape,

sodomy, sexual battery, and indecent liberties with a child are the primary sex offenses."
Moreover, the *Coburn* court further pointed out that the before-mentioned "sex offenses
can be broken down into three main categories:  (1) sexual intercourse, (2) sodomy, and
(3) touching." 38 Kan. App. 2d at 1045.

Nevertheless, as Gihring noted earlier in his brief, the before-mentioned
similarities found by the trial court can be described as general. Gihring relies on our
Supreme Court decision in *State v. Smith-Parker*, 301 Kan. 132, 158, 340 P.3d 485
(2014). Gihring argues in his brief that the *Smith-Parker* court

> "concluded that joinder was *not* proper under the 'same or similar character' provision
> even though both cases involved a single homicide because not enough other
> commonalities existed:  in one crime, the victim was killed during a burglary, in the
> other, the victim was a close friend and the dispute arose via an argument regarding the
> victim's treatment of the victim's girlfriend."

On the other hand, Gihring points out in *Ritz* that

> "joinder was proper for two fleeing-and-eluding charges when in both cases the
> defendant was driving a stolen car, the cops sought to pull the defendant over, the
> defendant admitted to fleeing in response, the flights occurred in residential
> neighborhoods, ending when the defendant wrecked the stolen car."

Gihring argues that his case is more like *Smith-Parker* than *Ritz*. In *Ritz*, he
contends that

> "the commonalities that the court found sufficient were commonalities *unique* to the
> fleeing-and-eludings as committed by the particular defendant and would not describe the
> vast majority of fleeing-and-eluding crimes. Here, however, as noted above, the
> similarities are too general—they describe the vast majority of all sexual encounters in a

66

college town. As such, they are generalities, which should not be the basis for joining the trials of two separate crimes."

Similar to *Smith-Parker*, the two rape charges are not similar in character. To illustrate, the offenses involved very different victims:  First, in C.S.'s case, she knew Gihring and pursued him—even inviting him over to a party and asking him to stay in her bedroom with her when her roommates left to get food. On the other hand, in S.W.'s case, she claimed to have not known Gihring at all before she "woke up" while he was engaging in sexual intercourse with her. Second, C.S.'s accusation of rape and sodomy occurred at her off-campus apartment, in her private bedroom and bathroom. On the other hand, S.W.'s accusation of rape occurred in a common sleeping area at a fraternity house and then on a balcony in that house. Third, C.S. alleged that she was raped and sodomized by only Gihring. On the other hand, S.W. alleged that she was raped twice by Farquhar and then she was raped by Gihring. Two of those accusations of rape occurred at the fraternity house where Farquhar and Gihring were members of the same fraternity. Moreover, both of those accusations of rape by Farquhar and Gihring occurred at the fraternity house within hours of each other. Fourth, other people witnessed S.W. and Gihring having sex. On the other hand, no one witnessed C.S. and Gihring having sex.

Fifth, C.S. remembered many of the details surrounding the night and morning of the alleged rape and aggravated sodomy. This differs substantially from S.W.'s case. S.W. did not remember any of the sexual activity between her and Farquhar before she was allegedly raped by Gihring. As a result, the State granted Farquhar transactional immunity for his testimony in this case.

Sixth, the victims were not treated similarly. For example, the State charged Gihring with rape of S.W. under alternative theories:  that she was unconscious, that she was physically powerless, or that she was incapable of giving consent because of the effects of alcohol. The State charged Gihring with rape and aggravated criminal sodomy

67

of C.S. under the single theory that she was incapable of giving consent because of the effects of alcohol. As a result, C.S. maintained that she had sex with Gihring when she was too intoxicated to consent. On the other hand, S.W. alternatively maintained that she was unconscious or that she was physically powerless when Gihring had sex with her.

Seventh, the evidence necessary to prove the rape of S.W. and the rape and aggravated sodomy charges of C.S. was different. Thus, there was no real overlapping proof of the rape and the aggravated sodomy charges of C.S. and the rape of S.W.

Last, these charges involved different victims. Accordingly, the State could prove the rape and aggravated sodomy charges of C.S. without using any of the evidence needed to prove the rape charge of S.W. The rape and aggravated sodomy charges of C.S. were proved through the testimony of C.S. and those individuals whom she told about the incidents. On the other hand, the rape charge of S.W. was proved through the testimony of S.W. and those individuals whom she told about the incidents, as well as Farquhar, who testified that both he and another individual witnessed Gihring having sex with S.W.

As a result, the proof of the charges in C.S.'s case depended on a different set of facts from the set of facts needed for proof of the rape charge in S.W.'s case. In short, the rape and the aggravated sodomy charges of C.S. depended on different evidence for their proof than the evidence needed for proof of the rape charge of S.W.

As previously stated, charges of the same or similar character may be joined in the same information when "'all of the offenses charged are of the same general character, *requiring* the same mode of trial, *the same kind of evidence*, and the same kind of punishment.'" (Emphases added.) *Barksdale*, 266 Kan. at 507. Here, the same kind of evidence requirement under the same or similar character condition was not met. See *Coburn*, 38 Kan. App. 2d at 1046.

Thus, I conclude that the charges were not of a sufficiently similar character to justify joinder under K.S.A. 22-3202(1).

*Jumbling*

Next, Gihring argues that the charges arising from the two victims into a single trial significantly increased the risk of jumbling and jury confusion. Gihring noted in his brief that C.S. and S.W.

> "[e]ach reported their alleged rapes to different authorities, at different times, saw different nurses, spoke with different detectives, and received differing feedback from close friends and family. Such jumbling prevented 'that concentrated consideration of each case which is indispensable in matters of such gravity.' *Barksdale*, 266 Kan. at 508; *Thompson*, 139 Kan. at 61-62."

Nevertheless, as Gihring points out in his brief, the trial court "concluded that 'jumbling' would not occur any more than it would occur if the evidence of the other case was brought in as propensity evidence under K.S.A. 60-455(d)." But Gihring disagrees. He argues that the trial court erroneously concluded that evidence of the other crime would have been admitted at each trial under K.S.A. 2018 Supp. 60-455(d). He further argues that it would have been more prejudicial than probative to introduce evidence of C.S.'s case at the trial on S.W.'s accusations.

Moreover, Gihring contends that "propensity evidence in rape cases is *not* automatically admissible. Rather, the district court must first determine that such evidence is relevant and probative. K.S.A. 60-455(d). Then, it may only admit the evidence if it determines that such evidence is more probative than it is prejudicial."

*K.S.A. 60-455*

In 2009, the Kansas Legislature amended K.S.A. 60-455. K.S.A. 2018 Supp. 60-455(d) now provides in relevant part:

> "Except as provided in K.S.A. 60-455, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under articles . . . 54, 55 or 56 of chapter 21 of the Kansas Statutes Annotated, or K.S.A. 2018 Supp. 21-6104, 21-6325, 21-6326 or 21-6419 through 21-6422, and amendments thereto, evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and *may be considered for its bearing on any matter to which it is relevant and probative*." (Emphasis added.)

Our Supreme Court has continued to require the trial court to balance the probative value of the evidence in question against the prejudicial value of the evidence in question when considering evidence admitted under K.S.A. 2018 Supp. 60-455(d). See *State v. Prine*, 297 Kan. 460, 478, 303 P.3d 662 (2013) (holding that the court would "leave the question of whether the necessity of this weighing persists under new [K.S.A. 2009 Supp. 60-455[d]) to another day"); see also *State v. Bowen*, 299 Kan. 339, 350, 323 P.3d 853 (2014) (where our Supreme Court engaged in the balancing test when analyzing the admission of evidence under the new K.S.A. 2010 Supp. 60-455[d]).

Thus, quoting *Bowen*, Gihring maintains that when determining whether to admit prior bad acts, courts must consider the following: "'(1) how clearly the prior act has been proved; (2) how probative the evidence is of the material fact it is admitted to prove; (3) how seriously disputed the material fact is; and (4) whether the government can avail itself of any less prejudicial evidence.'" *Bowen*, 299 Kan. at 350. In addition, Gihring points out that when analyzing the probative dangers, a court considers: (1) how likely it is such evidence will contribute to an improperly based jury verdict; (2) the extent to which such evidence will distract the jury from the central issues of the trial; and (3) how

70

time consuming it will be to prove the prior conduct, citing *State v. Boysaw*, 52 Kan. App. 2d 635, 649-50, 372 P.3d 1261 (2016), *aff'd* 309 Kan. ___, ___ P.3d ___ (No. 112,834, filed April 19, 2019) (citing favorably *United States v. Benally*, 500 F.3d 1085, 1090 [10th Cir. 2007]).

Here, as Gihring points out in his brief, the trial court determined that it would permit the joinder of the claims because it would admit the other case as evidence in each case, so there was no prejudice to joining the cases. Specifically, the trial court held that it would be more probative than prejudicial to introduce each case into evidence at each other's trial under K.S.A. 2018 Supp. 60-455(d).

In weighing the probative versus prejudicial value of other crimes evidence, the trial court made the following conclusions: (1) that each act was clearly proved because Gihring was bound over on both sets of charges after a preliminary hearing; (2) that each case was probative to the other because of "certain similarities"; (3) that on how seriously disputed the material facts were, the court held "the disputes do not relate to [the] identity of the defendant, but rather consent and or the ability to consent due to alcohol"; and (4) that neither party suggested any less prejudicial evidence of which the State could have availed itself.

Furthermore, on the potential probative dangers, the trial court determined: (1) that the risk of an improper verdict was low if they were tried together because each would get its own verdict, and moreover, "the [court] [did] not believe these circumstances would have a different likelihood than other cases with K.S.A. 60-455 evidence"; (2) that on whether such evidence would distract the jury from the central issues of the trial, it held: "if the charges are not severed, both acts are central issues. Likewise, there would be separate jury instructions for each charge. If severed, the charged act would be central and the non-charged act could have the affect [*sic*] of distracting the jury . . . ."; and (3) that on how time consuming it would be to prove the

71

prior conduct, "[i]t would be no more so if the case remain[ed] joined than severed. Assuming the charges were not currently joined, and viewing it in the context of K.S.A. 60-455 the time would not be prohibitive."

Gihring argues that the trial court legally erred when it used the test of K.S.A. 2018 Supp. 60-455(d) to determine if joinder or severance was more properly based on the trial court's foregone conclusion that such evidence would be admissible. Gihring contends that the trial court did not analyze those factors to first determine *if* such evidence would be admissible. Gihring argues that the K.S.A. 2018 Supp. 60-455 facts are a *prerequisite* to a determination of admissibility, not a test for severance or joinder once admissibility is determined. Gihring further argues that had the trial court properly applied these factors, it would not have considered the effect of severance or joinder on each factor. In addition, the trial court would have considered the effect of admitting prior crimes evidence on Gihring's constitutional right to a fair trial.

In his brief, Gihring analyzes the factors as follows:

● "*How clearly the prior act has been proven*: Here, neither prior act had been proven to a jury beyond a reasonable doubt before the court determined it could be used as evidence in the trial of another. After the trial, we know that Mr. Gihring was acquitted of the alleged rape and sodomy of C.S., meaning, those crimes were not and could not be proven beyond a reasonable doubt. Thus, the crimes against C.S. were not sufficiently proven to have this factor weigh in favor of admitting those accusations in the trial against Mr. Gihring on the accusations by S.W. Thus, this factor weighs *against* admitting the prior acts.

● "*How probative the evidence is of the material fact it is admitted to prove*: These allegations had some similarities, but not enough to prove propensity. The conduct of Mr. Gihring, even according to the alleged victims, that the allegation he committed one crime did not make it more or less likely he had the propensity to commit the second. Indeed, having sex with C.S. after she consented while drunk, doesn't make it more or

72

less likely that he had sex with S.W. when she was unconscious. Thus, this factor also weighs *against* admitting the other-crimes evidence.

● "*How seriously disputed the material fact is*:  The idea of propensity evidence in this case was actually a bit misplaced. Mr. Gihring didn't dispute that he had sex with both women, or that they had been drinking. What was at issue was their ability to consent based on their level of intoxication, and whether S.W. consented at all. This means the focus was on what the women did or did not do to communicate consent or lack thereof, more than it was on Mr. Gihring. As such, propensity evidence was not particularly probative in these cases and weighs *against* admitting one case in the trial of the other.

● "*Whether the government can avail itself of any less prejudicial evidence*:  Even if the State used these crimes to show propensity to commit the other, it would certainly have been able to do so in each trial without bringing in every witness to each. It would have been far less prejudicial in the trial of S.W. for the jury to learn, perhaps via stipulation, or a single witness, that Mr. Gihring had been charged with having sex with another woman when she was too intoxicated to consent, that his defense was she did consent and was not too intoxicated to do so, and the jury acquitted him. Thus, there was less prejudicial evidence the State could have availed itself of than trying the cases together, even to show propensity. As such, the evidence that was introduced could have been less prejudicial, so this factor, too, weighs *against* its admission.

● "*How likely it is the evidence will contribute to an improperly-based jury verdict*:  Putting on all witnesses for each crime in the trial of the other increased the danger that the jury would convict him based on the belief he was a bad person and therefore deserved to be punished. This factor also weighs *against* admitting the other-crimes evidence.

● "*The extent to which the prior crimes evidence will distract the jury from the central issues of the trial*:  Putting on evidence of each crime at the trial for the other would have been very distracting for the jury, thus, this factor weighs *against* permitting the admission of the K.S.A. 60-455 evidence.

● "*How time consuming it would be to prove the prior conduct*:  admitting the prior crimes evidence in these matters would not likely have significantly increased the trial time. This factor weighs *for* admitting the K.S.A. 60-455 evidence."

Gihring asserts that "[h]ad the [trial] judge properly weighed whether the evidence would have been admissible [as] K.S.A. 60-455 evidence in the absence of the joinder question, [he] would have concluded the evidence was not admissible."

In *Coburn*, this court asked this question: "[I]f the admission of certain evidence is highly prejudicial to a defendant under K.S.A. 60-455, would the same evidence not be highly prejudicial to a defendant under K.S.A. 22-3202(1)?" 38 Kan. App. 2d at 1052.

The *Coburn* court noted:

> "[I]n a rape prosecution case involving an improper joinder of charges, Justice Lee Johnson, while a member of this court, cited K.S.A. 60-455 in pointing out the risk of prejudicial joinder and the inappropriate use of propensity evidence under the joinder statute:
> "One can only surmise that by consolidating the accumulated rape reports in one prosecution, the State hoped to strengthen all three cases by inferring that [the defendant] was disposed to commit date rape. Promoting the jury's use of character propensity reasoning would not be allowed in a separate trial. See K.S.A. 60-455. It should not be permitted via the use of joinder.' *State v. Bunyard,* 31 Kan. App. 2d 853, 871-72, 75 P.3d 750 (2003) (Johnson, J., dissenting), *rev'd on other grounds* 281 Kan. 392, 133 P.3d 14 (2006)." 38 Kan. App. 2d at 1052-53.

Although our Supreme Court later followed this court's majority position and determined that the *Bunyard* cases were sufficiently similar to one another and determined that joinder was proper (*Bunyard*, 281 Kan. at 402-04),

> "Justice Johnson's remarks, however, still underscore the problem with criminal disposition evidence in joinder cases: that a jury may use the evidence of one of the charged crimes to infer a criminal disposition on the part of the defendant, which the jury uses to find the defendant's guilt of the other charged crime or crimes." *Coburn*, 38 Kan. App. 2d at 1053.

74

Except for the generalities previously noted, these two cases are very different. Gihring noted that many of the lay witnesses did not overlap, that disclosures were made to different individuals, that different doctors and nurses examined C.S. and S.W., and that the medical evidence varied for each of them. Moreover, the evidence did not constitute a common scheme or plan. In addition, there was no evidence relating the charges against Gihring as to C.S. that was intertwined with or necessary to prove any of the charges against him as to S.W. or vice versa.

Because the probative value of the K.S.A. 2018 Supp. 60-455(d) evidence would be substantially outweighed by risks of prejudice and confusion of issues, especially when considering the prosecutor's closing prejudicial propensity argument, Gihring was prejudiced by the joinder of these cases. Thus, the K.S.A. 2018 Supp. 60-455(d) evidence was sufficiently prejudicial as to deny Gihring a fair trial.

Finally, I have difficulty in concluding, as the majority does, that no prejudicial jumbling occurred in this case because "the jury was instructed that each crime charged was a separate and distinct offense and must be considered independently on the evidence and law applicable to each charge." Slip op. at 23. The majority's position fails to take into account that the jury could have found Gihring guilty because of the collective proof and the prejudice of being charged with multiple sexual offenses. The jury may have arrived at the proposition Justice Johnson once warned against: Men who have been previously accused of raping someone are more likely than not to have raped someone than men who have never been accused of raping someone. Indeed, Justice Johnson's proposition was borne out by a prosecutor's improper closing argument.

As pointed out under the misstatement of law section of the dissent, the prosecutor told the jurors: "Now the Judge has told you that the charges in this case [C.S.'s case] are separate but that doesn't mean you can't use evidence in one person's case in the other. So let's look at [S.W.'s] case. . . . These cases are circular. [C.S.'s] case supports [S.W.'s]

75

[S.W.'s] case supports [C.S.'s.] The defendant is someone who will sexually assault a young woman he is entrusted to take care of." The prosecutor used the joinder of these charges to make this prejudicial propensity argument to the jury in violation of the following jury instruction: "You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge."

The prosecutor's argument to the jury was clearly improper. Here, "each additional unrelated charge took on a weight by virtue of being joined with the others whereby the whole exceeded the sum of its parts." *Rearick v. Com.*, 858 S.W.2d 185, 188 (Ky. 1993). Thus, the joinder of C.S.'s case and S.W.'s case tended "'to prevent that concentrated consideration of each case which is indispensable matters of such gravity.'" *Barksdale*, 266 Kan. at 508.

*Fatally Prejudicial*

On the other hand, assuming for the sake of argument that one of the joinder requirements under K.S.A. 22-3202(1) was met, the trial court was under a continuing duty to grant a motion for severance "to prevent prejudice and manifest injustice to the defendant." *State v. Shaffer*, 229 Kan. 310, 312, 624 P.2d 440 (1981). The *Coburn* court recognized that "the requirements for joinder of charges under K.S.A. 22-3202(1) are similar to those concerning the joinder of two or more defendants under K.S.A. 22-3202(3)." 38 Kan. App. 2d at 1059. In support of this position, the *Coburn* court quoted our Supreme Court where it stated, in interpreting K.S.A. 22-3202(3), that "'even though the requirements of joinder are technically satisfied, the court should not join two defendants in one trial if either defendant will be prejudiced by the joinder. [Citation omitted.]' *State v. Aikins*, 261 Kan. 346, 360, 932 P.2d 408 (1997)." *Coburn*, 38 Kan. App. 2d at 1059.

Additionally, in pointing out what should guide the trial court's inquiry concerning joinder, the *Aikins* court stated the following: that a defendant's right to a fair trial must be the overriding consideration of the trial court. 261 Kan. at 360; see also *State v. Boyd*, 281 Kan. 70, 81, 127 P.3d 998 (2006) ("Separate trials should be conducted upon a showing of actual prejudice stemming from a joint trial and, in such a circumstance, the trial court should not join the complaints or, if the complaints have been joined, should sever the cases for trial."). In the present case, the current record shows that even if joinder was proper under K.S.A. 22-3202(1), the joinder was prejudicial to Gihring in the sense of denying him a fair trial. Moreover, the denial of severance was manifest injustice.

To prevent prejudice and manifest injustice to Gihring, justice required a severance of the two cases. As a result, I would reverse Gihring's conviction and remand the case for a new trial.